## McKim, Appellant, *v.* Philadelphia.

*Municipalities—Streets—Electric railway company—Negligence.*

The legislature has authority to authorize an electric railway company to lay its tracks and operate its lines on the street of a municipality; and it may do so directly or by authorizing its agent, the municipality, to grant the authority, and it may empower the municipality to accompany the grant with such restrictions and limitations as may seem proper to protect the public in the use of the highways of the city. There is a duty, however, imposed upon the company, to exercise the power conferred by the municipality in such manner and way as not unnecessarily to obstruct the highway or interfere with the purpose for which it was primarily constructed.

Legislative authority which will shelter an actual nuisance in a street must be express, or a clear and unquestionable implication from powers conferred, certain and unambiguous, and such as to show that the legislature must have intended and contemplated the doing of the very act in question.

If a city permits a street railway company to construct its railway on the streets of a city in such a way as to render the use of the streets by the public unsafe and dangerous, the city will be responsible for injuries resulting therefrom.

Where a street railway company having authority from a city to use a street, plants a trolley pole in the middle of the street, and the conical base of the pole is about two and one-half feet in diameter at the street level, and about fifteen or eighteen inches in height and there is no artificial light on the pole nor in its vicinity, the city is responsible for the death of a man caused by the upsetting of a wagon on a dark night by the base of the pole. In such a case the fact that there was ample space between the curb and pole for teams to pass and repass, does not alter the case.

*Evidence—Opinion of witnesses.*

Where mere descriptive language is inadequate to convey to the jury the precise facts, or their bearing on the issue, a witness may be allowed to supplement his description by his opinion, to put the jury in position to determine the facts in issue; but when the circumstances are such that they can be fully and accurately described to the jury, and their bearing on the issue, estimated by persons without special knowledge or training, opinions of witnesses expert or other, are inadmissible.

Argued Jan. 25, 1907. Appeal, No. 299, Jan. T., 1906, by plaintiff, from judgment of C. P. No. 3, Phila. Co., Dec. T.,

1903, No. 2,542, on verdict for defendant in case of Elizabeth McKim v. City of Philadelphia. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER and STEWART, JJ. Reversed.

Trespass to cover damages for death of plaintiff's husband. Before McMICHAEL, J.

The facts are stated in the opinion of the Supreme Court.

Verdict and judgment for defendant. Plaintiff appealed.

*Errors assigned* were (1–10) rulings on evidence; (11, 12) binding instructions for defendant.

*Joseph R. Fahy*, for appellant.—The use of these streets, under the peremptory mandate of the state legislature, could only be given by city council, to the traction companies, upon conditions that provided for the protection and convenience of public travel. It was imperatively provided that city council exact protection and convenience for public travel: Kinsey's Opinions, 1895, pp. 117–120; Little v. Telegraph Co., 213 Pa. 229; Lamb v. Pike Township, 215 Pa. 516; Northern Cent. Ry. Co. v. Com., 90 Pa. 300; Com. v. Northern Cent. Ry. Co., 7 Pa. Superior Ct. 234; Potts v. Philadelphia, 195 Pa. 619; Bodge v. Phila., 167 Pa. 492; Powers v. Phila., 18 Pa. Superior Ct. 621.

The safety of the traveler, by any means, is the question: Davis v. Corry City, 154 Pa. 598; Nudd v. Lansdowne Boro., 190 Pa. 89; Bloomsburg Steam, etc., Co. v. Gardner, 126 Pa. 80; Siegler v. Mellinger, 203 Pa. 256.

The unguarded condition of a dangerous obstacle in the middle of the street is the question, not the width or narrowness of the road: Wall v. Pittsburg, 205 Pa. 48.

To repair a street requires the abatement or removal of all obstructions, and where they exist the municipality must take the precaution to warn travelers on the highway of their presence: Hey v. Phila., 81 Pa. 44; Fritsch v. Allegheny, 91 Pa. 226; Born v. Allegheny, etc., Plank Road Co., 101 Pa. 334; Burrell Township v. Uncapher, 117 Pa. 353; Lamb v. Pike Township, 215 Pa. 516; Phila. v. Weller, 4 Brews. 24; Trego v. Honeybrook Boro., 160 Pa. 76; Frazier v. Butler Boro., 172 Pa. 407; Canfield v. Boro. of East Stroudsburg, 19 Pa. Superior Ct. 649.

*Thos. Raeburn White,* assistant city solicitor, with him, *John L. Kinsey,* city solicitor, for appellee.—The trolley pole with which the deceased collided was located by authority of law : Philadelphia v. Citizens' Pass. Ry. Co., 151 Pa. 128 ; Reeves v. Philadelphia Traction Co., 152 Pa. 153.

The pole being a lawful structure, this action cannot be maintained : Livingston v. Wolf, 136 Pa. 519 ; Cushing v. Boston, 128 Mass. 330 ; Stackhouse v. Vendig & Co., 166 Pa. 582 ; Com. v. Beaver Boro., 171 Pa. 542.

The discretion of councils was properly exercised : Rafferty v. Traction Co., 147 Pa. 579 ; Halsey v. Ry. Co., 47 N. J. Eq. 380 (20 Atl. Repr. 859) ; Reeves v. Phila. Traction Co., 152 Pa. 153 ; Lockhart v. Railway Co., 139 Pa. 419.

The city is not responsible for the absence of light : Canavan v. Oil City, 183 Pa. 611 ; Horner v. Philadelphia, 194 Pa. 542 ; Baily v. Philadelphia, 184 Pa. 594.

OPINION BY MR. JUSTICE MESTREZAT, March 11, 1907 :

Eleventh street in the city of Philadelphia extends north and south, and crosses Federal street nearly at a right angle. At the place of this accident it is one hundred feet wide and seventy feet from curb to curb, and in the middle has a single-track electric railway line on which cars run north. The supply wires of the trolley system are supported by metal poles, placed alternately on the right and left, and near the track instead of at the curb. One of these poles stood near the west rail and about ten feet north of the north house-line of Federal street. It was of iron, about nine or ten inches in diameter and supported by a conical shaped base which was about two and one-half feet in diameter at the street level and fifteen or eighteen inches in height.

John McKim, a milk dealer and the plaintiff's husband, drove a one-horse milk wagon east on Federal street about 5:45 o'clock in the morning of January 24, 1903. He entered Eleventh street and, turning to go north, his wagon struck the base of the trolley pole, was upset, and he was thrown to the ground and received severe injuries from which he died a few hours later. The morning was very dark, and there was no artificial light on the pole nor in the vicinity of the pole. There is an electric street light located at the southeast corner

of Eleventh and Federal streets, but it had not been lighted for at least a week prior to the accident. McKim's wagon carried a light as required by city ordinance.

This action was brought by the widow of McKim to recover damages for his death which she alleges was caused by the negligent and improper conduct of the city in not keeping its street, at the place of the accident, in a reasonably safe condition for persons who had occasion to use it. She avers in her statement that the city permitted the pole with its large projecting base to remain in the street for more than two years without providing "means whereby such structural obstruction should be exposed or made conspicuous by proper light," and during the night of January 23, 1903, "without fixing or placing any light or signal near such obstruction to denote its position." The defense is that the trolley pole was located by authority of law, was a lawful structure, and was therefore not a nuisance, and that it was not an omission of duty on the part of the city to permit it to be constructed or remain on the location where it was placed without providing the necessary means to protect the public, using the street at night, against danger incident to a collision with it. On the trial below, the court directed a verdict for the defendant, and the plaintiff has taken this appeal.

It is conceded by the appellant that the trolley company was authorized by legislative and municipal action to locate and operate its railway on Eleventh street and to place the poles, carrying the wires which supply electricity, along and near its track in the center of Eleventh street. But the line was required to be constructed and maintained subject to municipal regulations and approval, as the city ordinance of August 5, 1886, provides that "the laying, construction and maintenance of all wires, . . . . poles, or cables shall be under the supervision of the chief of the electrical bureau and subject to his approval; and the same shall be laid under the rules and regulations of the board of highway supervisors."

There is no doubt of the authority of the legislature to authorize an electric railway company to lay its tracks and operate its lines on the streets of a city or of any other municipality. And it may do so directly or by authorizing its agent, the municipality, to grant the authority, and it may

empower the municipality to accompany the grant with such restrictions and limitations as may seem proper to protect the public in the use of the highways of the city. In 2 Abbot on Municipal Corporations, sec. 829, it is said : " The legislature or one of its properly delegated agencies may, by its action, authorize the use of a street in such a manner as will cause obstruction, and which, without authority, would be regarded as illegal and a nuisance. The discretionary power is often given municipal bodies to authorize these encroachments or obstructions and where an abuse of discretion is not shown, their action will be sustained if coming within the general principles in respect to the creation and use of a highway." What, therefore, would otherwise be a nuisance if placed in a street may be legalized and relieved of this fault by legislative or municipal action.

Conceding the right of the electric company to place its poles in the center of the street and that, by reason of municipal permission, they do not create a nuisance by being located there, yet there was a duty imposed upon the electric company to exercise the power conferred by the municipality in such manner and way as not unnecessarily to obstruct the highway or interfere with the purpose for which it was primarily constructed. Unless the intention is manifest, it will not be presumed that the legislature or its agent, the municipality, intended, when granting the right of the company to locate its poles in the middle of the street, to deprive the public of the right to use the street without danger and with safety to themselves. This is made more apparent by the fact that the city ordinance requires the poles to be located under the supervision and subject to the approval of the municipal officers. When an electric company invokes municipal action for its protection in occupying the streets of a city, it must appear that the company acted strictly in accordance with the authority conferred. In stating the English rule on the subject, Chief Justice Cockburn in Vaughan v. Taff Vale Ry. Co. 5 H. & N. 679 (685) says : " When the legislature has sanctioned and authorized the use of a particular thing and it is used for the purpose for which it was authorized, and every precaution has been observed to prevent injury, the sanction of the legislature carries with it this consequence, that if damages result

from the use of such thing independently of negligence, the party using it is not responsible." That rule, of course, is limited in this country by the constitutional provision that prohibits the legislature from taking private property for public use without just compensation. But aside from this limitation, the rule as stated by the learned Chief Justice is certainly sound in principle, and clearly indicates that the beneficiary of the authority granted is required to exercise the legislative grant without negligence and with the necessary precaution to prevent injury to another. In a recent work on nuisances it is said that the rule may be stated to be that where one has the sanction of the state for what he does unless he commits a fault in the manner of doing it, he is completely justified, provided the legislature has the constitutional power to act: Joyce on Law of Nuisances, sec. 69. And in sec. 73 of the same work, citing authorities to support the text, it is said : " So, though a corporation may be authorized by law to do a certain act, it must so use its powers as not to injure another. The fact that a work is a lawful and beneficial one will not relieve the party constructing it from liability to another who is injured by its improper and unskillful construction. The grant of a franchise by the state to a person does not confer upon him the right to inflict damage upon another which by reasonable caution could have been prevented." Mr. Smith in his "Modern Law of Municipal Corporations," sec. 1097, after announcing the doctrine that the legislature may authorize a person or corporation to do an injurious act which would otherwise be a nuisance, proceeds to say : " And if the power may be exercised in a way not to seriously injure the public, but is exercised in a way regardless of the public interest, there will be no legislative protection. The grant of power is in all cases to be exercised in such manner as to least interfere with public rights and interests, and by construction the grant or license is construed in favor of the public. Besides there is a high degree of care to be exercised in carrying out the grant of power in such cases." The rule is well stated by MITCHELL, J., in Village of Pine City v. Munch (Minn.), 6 L. R. A. 763, where he says : " If the legislature expressly authorizes an act which must inevitably result in public injury, what would otherwise be a nuisance

may be said to be legalized; but if they authorized an erection which does not necessarily produce such a result, but such result flows from the manner of construction or operation, the legislative license is no defense. In order to justify a nuisance by legislative authority it must be the natural and probable result of the act authorized, so that it may fairly be said to be covered by the legislation conferring the power: Wood, Nuisances, 853–861." In Babbage v. Powers (N. Y.), 14 L. R. A. 398, the defendant sought to excuse himself for maintaining a nuisance by having procured municipal permission for his act. It was held that he was not liable, in the absence of negligence; but VANN, J., delivering the opinion, says: " The person receiving the license is held to impliedly agree to perform the act permitted with due care for the safety of the public, and is made liable for any violation of duty in this regard." And in a more recent case in New York, Morton v. Mayor, etc., of New York, 140 N. Y. 207; s. c., 22 L. R. A. 241, it is held, as stated in the syllabus, that the legislative authority which will shelter an actual nuisance must be express, or a clear and unquestionable implication from powers conferred, certain and unambiguous, and such as to show that the legislature must have intended and contemplated the doing of the very act in question. " Lawful acts may be performed in such manner, so carelessly, negligently, and with so little regard to the rights of others," says AGNEW, J., in Pittsburg, Fort Wayne and Chicago Railway Co. v. Gilleland, 56 Pa. 445, " that he who, in performing them, injuries another, must be responsible for the damage."

Applying these principles to the case in hand, we think the learned court below erred in withdrawing the case from the jury and directing a verdict for the defendant city. In this state, as all our cases on the subject declare, the highways are primarily for the passage of persons on foot and in vehicles. It is the duty of the municipal authorities having control of the highways to keep that fact in view, and while permitting them to be used for other purposes, it should not be done in a manner which would prevent their use by the public or would render them unsafe and dangerous. Seventy years ago the legislature of this state declared that the public highways should be constantly kept in repair and kept clear of all im-

pediments to easy and convenient passing and traveling. This is the law of the commonwealth to-day, and includes the cities as well as the rural districts. The electric company was authorized by the ordinance to locate and operate its railway on Eleventh street, but there is nothing in the ordinance from which even an inference can be drawn that the use of Eleventh street by the company should exclude the public from it or that the company was authorized to construct or operate its railway in a manner which would render the street unnecessarily dangerous. As it was the duty of the city to keep its streets clear of unnecessary impediments or obstructions and reasonably safe for public use, we cannot assume or infer that the councils intended to hand over Eleventh street to the electric company with permission to erect and maintain obstructions on it in total disregard of the rights of the public. In view of this duty of the city and of the unquestioned duty of the electric company to construct this line so as to maintain the street in a reasonably safe condition for use by the public, the question arises in this case, whether the electric company observed its duty in exercising the authority conferred by the city, or whether it negligently erected this pole or negligently maintained it so as to cause the accident which resulted in the death of the plaintiff's decedent. These were questions for the jury. If the pole, either in its original construction, or in the manner of its maintenance, was dangerous to the public in the use of the street by day or night, municipal consent would afford the company no protection. The city, likewise, would be culpable, and liable to any person injured by reason of its neglect to protect him against the unlawful use of the street. In daylight, of course, the pole could be seen and avoided, but at night, and especially when it is very dark, as on this occasion, and could not be seen, a jury certainly would be justified in finding that it was a dangerous obstruction. If in the construction of its railway, it had been necessary to leave a hole in the street of equal dimensions with the base of the pole, it could not reasonably be pretended that municipal consent to construct the railway on the street would authorize such action on the part of the company unless the public was, by some means, warned by day and night of the existence and location of the hole. The hole, however, would not be more dangerous

than the base of the pole which caused McKim's death, and both would manifestly be a dangerous obstruction in the middle of a city street of a very dark night with no signals or lights to indicate their location. The rule which requires the streets of a city to be kept clear of dangerous impediments applies to the nighttime as well as to the daytime, and demands of the municipality action which will maintain the safety of the street during the whole of the twenty-four hours.

The fact that there was ample space between the pole and the curb for teams to pass and repass, as suggested by the appellee, does not alter the case. This pole stood nearly in the center of the street where a traveler would presume there was safety and where instinctively he would go of a dark night in order that he might have safe transit. This was a thickly populated community, and notwithstanding the width of the street, the city as well as the electric company should have expected the frequent use of every part of the street, both by night and day. Care under the circumstances, therefore, required the company, and on its default, the city, to give notice of the presence of the pole to those who might be using the street at night. It was a question for the company, subject to the approval of the city, to determine what was necessary for this purpose; the only obligation resting upon either of them was that they took reasonable precaution to accomplish the purpose intended. This might have been done by a light on the pole itself, or by lights in the immediate vicinity of the pole, or in other ways, that could be suggested. The failure, however, to observe any precaution to protect people using the street during the night became a question of negligence which should have been submitted to the jury.

It is not necessary in this case to discuss or determine the duty of a city to light its streets. The broad question presented for decision here is whether the city under the circumstances disclosed by the testimony was guilty of negligence in permitting a dangerous obstruction on one of its streets which resulted in the death of the plaintiff's decedent. That is a question which, under a proper charge by the court, was for the jury.

We are not convinced that the trial court erred in refusing to admit the opinions of the plaintiff's witnesses as to the dan-

gerous condition of the street. There was no difficulty here in the witnesses describing the pole, its size, the manner of its structure, its location, and all of the conditions existing at the place of the accident. Whether, under all the circumstances, the pole either in its original construction or in its maintenance was dangerous to public travel on that street of a dark night was as easily determinable by the jury as by the witnesses. Where mere descriptive language is inadequate to convey to the jury the precise facts, or their bearing on the issue, a witness may be allowed to supplement his description by his opinion, to put the jury in position to determine the facts in issue; but when the circumstances are such that they can be fully and accurately described to the jury, and their bearing on the issue, estimated by persons without special knowledge or training, opinions of witnesses, expert or other, are inadmissible: Graham v. Pennsylvania Co., 139 Pa. 149.

The eleventh and twelfth assignments are sustained, the judgment is reversed, and a venire facias is awarded.