[Civ. No. 7942. Third Dist. Dec. 26, 1951.]

THERMALITO IRRIGATION DISTRICT, Plaintiff and Respondent, v. CALIFORNIA WATER SERVICE COMPANY, Defendant and Respondent; PACIFIC GAS AND ELECTRIC COMPANY, Appellant.

Gerdes & Dunn and Price & Morony for Appellant.

Minasian & Steadman, McCutchen, Thomas, Matthew, Griffiths & Greene for Respondents.

SCHOTTKY, J. pro tem.—On December 18, 1946, respondent Thermalito Irrigation District (hereinafter referred to as "District") commenced this action against respondent California Water Service Company (hereinafter referred to as "Water Company") and appellant Pacific Gas and Electric Company (hereinafter referred to as "Pacific"). In its complaint it alleged that on April 25, 1923, Pacific had agreed to supply 9.1 cfs. of water to District, at wholesale, but that in 1927 Water Company had become Pacific's assignee in a transaction authorized by the California Railroad Commission, and that Water Company had thereafter supplied District; that Pacific owned and controlled Miocene Ditch (Canal) and has supplied Water Company with water therefrom, which was carried in Coal Canyon Ditch (Powers Canal) from which it supplied District.

It was further alleged that on December 6, 1946, District had received a letter from Water Company notifying it that Pacific intended to commence major repairs on Miocene Canal on December 15, 1946, and continue thereon until about April 15, 1947, during which period the Miocene supply would be shut off entirely, and that Water Company and Pacific had notified District that neither of them would furnish auxiliary water supply for District use.

District alleged that it had three other sources of water supply, Concow or Wilenor Reservoir, waters from which were carried through its Cherokee Ditch into and through Miocene Canal, which would be cut off for approximately half of the above stated period of making repairs, and natural run-

off after rains, diminishing from about four cfs. when operated continuously. District alleged further in its complaint that if the water in the Miocene Ditch was shut off as proposed by defendants, District would not have sufficient water to meet its minimum needs.

District obtained a mandatory order commanding said defendants to restore certain minimum flows of water through said Miocene Canal to District and thereupon Pacific restored service to a limited degree through said canal.

On December 23, 1946, the parties entered into a stipulation which provided that the parties should, at joint expense, pump water from Feather River for District uses until Wilenor water became available to District, and that the entire cost should be assessed by the judgment against the party finally adjudged in the action to have been obligated to supply *auxiliary, emergency or stand-by* water during such outage of Miocene Canal. It was further agreed in the stipulation that a mandatory order to restore delivery of Miocene water should be dissolved.

Pacific had complied with that order by carrying Miocene water in a canvas pipe, at an expense of about $2,000, past a place near the lower end of Miocene Canal where a 447-foot wooden flume was being replaced by a steel structure.

Pacific and Water Company each filed an answer, and Pacific filed a cross-complaint seeking a declaratory judgment that it was not under any duty to supply water or water service to the District, and that it was entitled to suspend water service to Water Company on or about December 15, 1946. Following a trial the court determined that Pacific's suspension of deliveries in 1946 was in breach of its obligations under the various contracts and in breach of its obligation as a public utility water corporation; that by reason of the unauthorized outage of the Miocene Canal Pacific alone became obligated to supply emergency, auxiliary or stand-by waters during said outage, and that District and Water Company were entitled to recover from Pacific the net amounts expended by them under the stipulation, with interest. Judgment was entered accordingly and this appeal is by Pacific from said judgment.

In arguing for a reversal of the judgment appellant Pacific makes the following main contentions:

1. That Pacific is under no obligation to sell or supply any water to District.

332

2. That the Wilenor water contract cannot be taken as controlling in any way Pacific's conduct of the public uses to which Miocene Canal is dedicated.

3. That it plainly appears from the contracts involved that Pacific has the right to suspend delivery of Miocene Water whenever it finds such suspension necessary for the purpose of making repairs upon or improvements in the Miocene Canal and for the duration of such necessity, without supplying either District or Water Company with other water.

Before discussing these contentions we shall review the factual situation as shown by the record. The water properties involved in the litigation are shown, schematically, in the drawing below.

Water flowing in the west branch of the North Fork of the Feather River is diverted by Pacific at the intake of the

SCHEMATIC DRAWING OF
P.G.& E.Co. WATER SYSTEM INVOLVED
1922

West Branch of North Fork
of Feather River

Upper
Miocene Canal

Kunkle Reservoir

Lime Saddle
Power House

Lower Miocene Canal

Wilenor Reservoir and Cherokee
Ditch. Sold to Ther. Irrig. Dist.
March 29, 1923, with contract
to carry water in excess
capacity of Miocene Canal,
redeliver to District and pay
for power uses.

Consumers en route

Coal Canyon Power House

Consumers en route

Powers Canal

Feather River

Thermalito Distribution System
Sold to District April 25, 1923,
and P.G.&E. agreed to supply 9.1
C.F.S. to District.

Oroville Distribution
System. Sold with
Powers Canal to
Calif. W. Service Co.
in 1927.

Miocene Canal, is passed through Pacific's powerhouses and is delivered to the Water Company at the head of the Powers Canal, through which the water flows to the City of Oroville, certain irrigation consumers and Thermalito being served en route.

Pacific's appropriation dates back to the early mining days and is known as the Miocene water right. Prior to 1917 the Miocene and Powers Canals and the Miocene water right were owned by Oro Water Light and Power Company. The water right was dedicated to power and irrigation use on the Miocene Canal and to the consumers on the Powers Canal, in Thermalito and in the city of Oroville for irrigation, domestic, municipal and other uses. In 1917 the properties of the Oro Company were acquired by Pacific. The dedication of the Miocene right to the water users on the Powers Canal, in Thermalito and in the city of Oroville continued. Pacific was a public utility administering this dedicated water and, as such, was and is a public utility water company, having the ordinary duties and obligations of such a company.

In 1923 Pacific sold to Thermalito the distribution system within the district then owned by Pacific, and entered into an agreement with Thermalito dated April 25, 1923, by which Pacific agreed to furnish 9.1 second feet of water to the District from the Powers Canal at wholesale. Pacific pleads that by this contract it undertook the public service duty of supplying water to the District at wholesale.

As a part of the same transaction Pacific also sold to Thermalito a reservoir and reservoir site on Concow Creek, known as Concow Reservoir, which was enlarged into and became known as Lake Wilenor, together with a ditch or canal leading from Concow Reservoir to its connection with the Miocene Canal, and entered into an agreement with Thermalito dated March 29, 1923, providing for the transmission of Lake Wilenor water through the Miocene Canal (including the Powers Canal) to the District's point of diversion, when there should be unused capacity in the Miocene Canal for such purpose, and for the use of the water in Pacific's powerhouses. This agreement is known as the Wilenor Contract. The contract contains the provision which, together with a like provision in the Oroville Water Contract hereinafter referred to, gives rise to the principal controversy in this case. Paragraph 8 of the Thermalito Contract reads as follows:

"The Company, whenever it shall find it necessary for the purpose of making repairs or improvements to its water sys-

tem, shall have the right to *suspend temporarily* the delivery of water hereunder, but in all such cases as reasonable notice thereof as circumstances will permit will be given to the District and the making of such repairs or improvement will be prosecuted as rapidly as may be practicable, and, if practicable, at such times as will cause the least inconvenience to the District.'' (Italics added.)

The situation at this point then was the Pacific owned the Miocene Canal, upper and lower, the Powers Canal, the two powerhouses and the distribution system in Oroville. It owned and administered the Miocene water right, which was dedicated to public use for power purposes in the two powerhouses and then to irrigation, domestic, commercial and other uses along the Lower Miocene Canal, and the Powers Canal, including the wholesale supply to Thermalito and in the city of Oroville and vicinity.

In 1927 Pacific sold the Powers Canal and its distribution system in Oroville and vicinity to the Water Company. This sale did not include the Miocene Canal, either upper or lower, nor either of the powerhouses nor the Miocene water right. Upon the transfer the Water Company assumed the duty of furnishing water to the consumers on the system so sold (hereinafter referred to as the Oroville water system), including Pacific's obligation under the Thermalito Contract to deliver water to Thermalito as and to the extent provided in the Oroville Water Contract next referred to.

This purchase was part of a larger purchase by which the Water Company acquired from Pacific some six water properties. In most instances the Water Company purchased, along with the distribution system, Pacific's source of water supply for the system; but in the case of the Oroville water system, inasmuch as Pacific was retaining the Miocene Canal and the Lime Saddle and Coal Canyon powerhouses it also retained the Miocene water right by which the powerhouses were operated.

Under date of April 19, 1927, Pacific and the Water Company entered into a contract known as the Oroville Water Contract, by virtue of which Pacific undertook the public service obligation of supplying water to the Water Company, at wholesale, at the head of the Powers Canal and out of the Miocene water right, for the Oroville water system, including Thermalito. The purchase price for the system included the water for a period of 25 years, which was to be delivered free of charge until after May 1, 1952, after which the water

is to be furnished at rates fixed by the Railroad Commission, now the Public Utilities Commission. The contract provided that the Water Company assumed all of the obligations imposed on Pacific, by law or contract, to supply water for municipal, domestic, irrigation and other uses, "which is now (i.e., in 1927) furnished by means of the aforesaid water properties this day conveyed by the Seller to the Buyer as hereinbefore recited, including the obligation of the Seller to deliver water to said Thermalito Irrigation District . . ." in accordance with the terms of the Thermalito Contract.

The Oroville Water Contract contained a provision like the one quoted above from the Thermalito Contract providing as follows:

"10. The Seller, whenever it shall find it necessary for the purpose of making repairs upon or improvements in its water system from which water shall be delivered to the Buyer hereunder, shall have the right to *suspend temporarily* the delivery of water hereunder but in all such cases as reasonable notice thereof as circumstances will permit will be given to the Buyer and the making of such repairs or improvements will be prosecuted as rapidly as may be practicable and, if practicable, at such times as will cause the least inconvenience to the Buyer." (Italics added.)

At the time of Pacific's sale of its system in the District to Thermalito, and again at the time of the sale of its Oroville water system to the Water Company, Pacific had no stand-by service of any kind, either for Thermalito or for the Oroville water system. The District and the city were dependent, for their water supply, upon water furnished through the Powers Canal from the Miocene Canal, except for temporary run-off which could be picked up by the Powers Canal during and for a short time after storms.

The evidence was that the Water Company and the District could take care of themselves for a few hours up to a day or so, particularly in winter months when water consumption was low, without a supply of Miocene water, by the water in the Powers Canal and in the small system reservoirs owned by the District and the company, and, if there was a local run-off, for a longer period of time, but, except for such temporary periods, repairs and improvements on the Miocene Canal would have to be made either (a) without interrupting the service through the canal, or (b) by agreeing to restore service on short notice should local run-off be in-

sufficient to meet the needs of Oroville and vicinity, including Thermalito, or (c) by the installation of temporary by-passes or by furnishing auxiliary or substitute facilities for supplying water.

As to the method of actual operation under the contracts for a period of 19 years and up to the time of the incidents which gave rise to this litigation the consistent practice as shown by the evidence was as follows:

(a) Whether the proposed outage of the Miocene Canal was an emergency or planned outage, Pacific would give the Water Company notice and would inquire as to what the water needs of the Water Company would be for supplying the city and Thermalito during the period of the proposed outage.

(b) Pacific then would make provision to take care of the Water Company's needs by either (1) by-passing sufficient water to take care of the needs over and above the water available to the Water Company from local run-off and from the well which it put down in 1929 supplying about 900 gallons per minute, which is about 2 second feet, or (2) agreeing to restore service in the Miocene Canal on short notice from the Water Company that its needs could not be met by local run-off and the well supply. On occasions special arrangements were made between the two companies, and, of course, the Pacific was only undertaking to supply Miocene water.

On no occasion prior to the 1946 outage, which brought on this litigation, did Pacific ever give notice of an outage of the Miocene Canal or take it out of service and refuse to take care of the Water Company's needs in one of the ways stated above.

The record shows that Pacific regularly took the Miocene Canal out of service for annual maintenance and major repairs for periods ranging from a few days up to as much as 11 weeks. Extended outages through the years were common, but until 1946 the needs of the Water Company, over and above what could be obtained from local run-off and the well supply, were always provided by Pacific.

In 1946 there was an abrupt change. In November of that year Pacific gave notice that it would take the Miocene Canal out for repairs for a period from about December 15, 1946, until about April 15, 1947, and that during such period it would not furnish water to the Water Company, as in the past, either by by-passing or restoring service on short notice, should the Water Company be in need of water. On De-

cember 15, 1946, Pacific actually cut service in the Miocene Canal and furnished no further service until this suit was brought by Thermalito and a mandatory injunction obtained requiring Pacific to restore service. Thereupon, the parties by stipulation arranged for an auxiliary service while repairs on the Miocene Canal were being made, the burden of the cost to abide the event of this litigation.

In support of its contention that it is under no obligation to sell or supply water to the District, Pacific asserts that by virtue of the Railroad Commission's decision authorizing Pacific to sell and transfer the Oroville water system to the Water Company, it was relieved of its public service obligation in the area served by that system, which included Thermalito Irrigation District. The commissioner's order provided that upon the transfer Pacific "may cease to furnish and supply water service and is hereby relieved of the duties and functions of a water corporation in the territory in which it now furnishes water service by means of the water systems or properties it hereby authorized to sell."

The District in reply argues that the Railroad Commission had no authority to relieve Pacific of its obligation under the Thermalito Contract, as the District was not a party to said proceeding, and also because the Railroad Commission had no jurisdiction over irrigation districts.

It is unnecessary to discuss this contention of appellant Pacific at any length because there is nothing in the judgment holding that Pacific is under any obligation to sell or supply any water or water service to the district. Pacific is obligated to the Water Company to supply it with water for its needs and this includes the need of the District as one of the Water Company's consumers (at wholesale), and this is what the conclusions of law provide and what the judgment contemplates.

We agree with the following statement of the learned trial judge in his memorandum opinion:

"It is my opinion that by the substitution of the Water Company in place of the P. G. & E. as a direct seller of water to the District, the P. G. & E. did not thereby escape the responsibility incumbent upon it to see that the water for the District was supplied through the Water Company. The obligation of the P. G. & E. was in nowise changed, it was implied that the P. G. & E's obligation would continue, except that instead of the P. G. & E. supplying the water di-

rectly to the District it was supplied through the medium of the Water Company. I cannot believe that the Public Utilities Commission would have sanctioned the transfer unless there was carried with it this implied obligation.''

Likewise appellant's second contention, that the Wilenor water contract cannot be taken as controlling in any way Pacific's conduct of the public uses to which the Miocene Canal is dedicated, requires little discussion.

■ The judgment does not mention the Wilenor Contract. The first two paragraphs of the judgment relate solely to the recovery by the District and the Water Company of their expenses in the 1946 outage pursuant to the stipulation, and have no relation to the Wilenor Contract. The third paragraph granting declaratory relief refers solely to the Oroville Water Contract and the Thermalito Contract, both containing clauses providing that water deliveries may be suspended ''temporarily'' for repairs, and declares the meaning of those clauses. The judgment makes no attempt to construe the Wilenor Contract, and the mere fact that in the third conclusion of law it was stated that ''P. G. & E. had no right under said Thermalito contract or under said Wilenor Contract or under said Oroville Water Contract, or as a possible utility water corporation or otherwise to suspend water service,'' etc., would not constitute a ground for appeal even if, as appellant contends, said conclusion can be considered a determination that Pacific violated the Wilenor Contract, as said conclusion, insofar as it relates to the Wilenor Contract, was not carried into the judgment.

The final and principal contention of appellant is that it ''plainly appears from the contracts involved that Pacific has the right to suspend delivery of Miocene water whenever it finds such suspension necessary for the purpose of making repairs upon or improvements in the Miocene Canal and for the duration of such necessity, without supplying either District or Water Company with other water.''

Appellant states that under the Thermalito Contract and the Oroville Water Contract appellant Pacific obligated itself to exercise reasonable care and diligence to maintain the Miocene Canal in condition to carry water continuously and to its capacity in critical periods of the year, and appellant quotes the following provision in the Oroville Water Contract (there being a like provision in the Thermalito Contract) :

''The Seller, whenever it shall find it necessary for the purpose of making repairs upon or improvements in its water

system from which water shall be delivered to the Buyer hereunder, shall have the right to suspend temporarily the delivery of water hereunder but in all such cases as reasonable notice thereof as circumstances will permit will be given to the Buyer and the making of such repairs or improvements will be prosecuted as rapidly as may be practicable and, if practicable, at such times as will cause the least inconvenience to the Buyer.''

Appellant argues that the judgment destroys its rights under the above quoted provision of the contract because, asserts appellant, under the judgment only suspensions not adversely affecting District or Water Company are permissible and if they are adversely affected by any suspension of delivery another water supply must be provided by appellant Pacific. It argues further that if it had been intended by the parties that Pacific should not have the right to suspend deliveries so as to affect the other parties adversely, the above quoted paragraph would not have been included in the contract; and then if it had been intended that Pacific should supply water in lieu of Miocene water when Miocene Canal is out of service for repairs or improvements, it would have been so written in the contract.

Appellant contends that the contracts clearly state that Pacific shall have the right to suspend delivery of Miocene water whenever Pacific finds it necessary for the purpose of making repairs upon or improvements in its Miocene Canal and for the duration of such necessity, and that, by providing in its judgment that the phrase ''suspend temporarily'' is limited to a time not adversely affecting Water Company and District, the court ignored the fact that the contract itself defines the period of any ''temporary'' suspension of delivery as the time necessary for the purpose of making repairs or improvements as rapidly as practicable.

Appellant cites section 1858 of the Code of Civil Procedure and other authorities setting forth the familiar rule that in the construction of a contract the office of the judge is simply to ascertain and declare what is in terms or substance contained therein, and not to insert what has been omitted or to omit what has been inserted; and appellant argues that the terms of the contracts here involved are so clear that there is no room for reference to extrinsic evidence in aid of construction.

Respondents in reply argue that the word ''temporarily'' is a relative term and that what might be temporary

under one set of circumstances might not be so under a different set of circumstances; that there is nothing in the contracts defining the word ''temporarily,'' and that in its very nature the word lacks definite connotation, and what is meant by it in any particular context depends upon the circumstances under which it was used. They argue further that such being the case, the trial court was plainly authorized to consider the facts and circumstances surrounding the parties at the time they made the contract. They cite section 1860 of the Code of Civil Procedure, which provides:

''For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret.''

They also quote from *Universal Sales Corp.* v. *California Press Mfg. Co.*, 20 Cal.2d 751, where it is said at page 761 [128 P.2d 665]:

''As an aid in discovering the all-important element of intent of the parties to the contract, the trial court may look to the circumstances surrounding the making of the agreement [citing authorities] including the object, nature and subject matter of the writing [citing authorities] and the preliminary negotiations between the parties [citing authorities], and thus place itself in the same situation in which the parties found themselves at the time of contracting [citing authorities].''

We believe that evidence of the facts and circumstances existing when the contracts were entered into was properly admitted and considered by the trial court. This evidence shows that in the year 1923 there were 3,100 acres in the District, that its population was 528, that there were 158 domestic connections, including a county hospital, and that the area and its inhabitants were entirely dependent for a water supply and fire protection upon water taken out of the west branch of the Feather River and carried down the Miocene Canal to the District. In 1927, when the Oroville Water Contract was entered into Pacific was operating the Oroville water system, and had no stand-by or auxiliary service either for the District or for the city of Oroville, so that both the city and the District were absolutely dependent for their water supplies for water from Pacific except to the extent that local run-off might augment that supply. These facts were known to the parties and the contract was of course made

in the light of these facts. We do not believe that the parties could have intended that the city and the District should be without water service during any period of the outage of the Miocene Canal; and this is shown by evidence of the actual operations under the contracts, which evidence was properly admitted and considered by the trial court. ▮ As stated by our Supreme Court in *Universal Sales Corp.* v. *California Press Mfg. Co., supra,* at page 761:

"Also applicable here is the familiar rule that when a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court. (*Work* v. *Associated Almond Growers,* 102 Cal. App. 232, 235 [282 P. 965] ; 6 Cal.Jur. 304, § 184.) The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention. (2 Elliott on Contracts, § 1537; 12 Am.Jur. 787, § 249.) As was said in *Mitau* v. *Roddan,* 149 Cal. 1, 14 [84 P. 145, 6 L.R.A.N.S. 275] : 'It is to be assumed that parties to a contract best know what was meant by its terms, and are the least liable to be mistaken as to its intention; that each party is alert to his own interests, and to insistence on his rights, and that whatever is done by the parties contemporaneously with the execution of the contract is done under its terms as they understood and intended it should be. Parties are far less liable to have been mistaken as to the intention of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have impelled them to resort to law, and one of them then seeks a construction at variance with the practical construction they have placed upon it: . . . In its execution, every executory contract requires more or less of a practical construction to be given it by the parties, and when this has been given, the law, in any subsequent litigation which involves the construction of the contract, adopts the practical construction of the parties as the true construction, and as the safest rule to be applied in the solution of the difficulty.' "

▮ The record shows that prior to 1946 the practice had been for Pacific to give notice of curtailment of its water de-

liveries affecting the Water Company and the District, and to take care of the Water Company's requirements, either by by-passing the water or by arranging to cut the canal back into service on short notice if local run-off, plus the Water Company's well supply, were insufficient to meet existing needs of the Water Company and the District. Never, prior to the 1946 outage that brought on this litigation, was there an occasion when Pacific took the Miocene Canal out of service for repairs and refused to take care of the Water Company's needs (which included the needs of the District) by by-passing or by cutting the canal back into service; and prior to the 1946 outage neither the District nor the Water Company was ever out of water to meet minimum needs. This indicates that for 19 years Pacific recognized the right of the Water Company to water service that would not leave consumers in the city of Oroville and in the District without water even though that imposed upon Pacific the burden of by-passing the water or restoring service in the canal on notice in cases of extended repairs.

We believe that if the parties had intended that the interruptions of service should be for the duration of necessary repairs instead of ''temporarily'' they would have said so, and then the Water Company and the District would have been on notice that they would have to take care of themselves during such outages by finding some other source of supply without getting water from Pacific. But instead the parties stated in the contracts that Pacific might ''suspend temporarily'' the deliveries of water, and we believe that the trial court was fully justified in concluding that this contemplated brief interruptions of service while by-pass or other facilities were being cut in or cut out pending resumption of service on short notice should local run-off become inadequate.

We agree with the following statement of the trial judge in his memorandum opinion:

''What would be classed as a temporary suspension would depend entirely upon the circumstances. The meaning of the word 'temporarily' is quite definitely ascertained. It is a relative term, and what might be considered temporary under one set of circumstances could not be so considered under another set. I am of the opinion that as applied to the facts existing in connection with this water service by the P. G. & E. to both the District and the Water Company, any outage or suspension of service extending for such a length of time that the available adequate supply of water to either the District

or the Water Company becomes insufficient in any respect, it becomes the duty of the P. G. & E. to restore service to such extent and by such means as the said P. G. & E. may in its discretion select.''

No other points raised require discussion.

In view of the foregoing we conclude that the trial court correctly determined that Pacific's suspension of deliveries of water in 1946 was in breach of its obligations under the contracts with the District and the Water Company and in breach of its obligation as a public utility water corporation; that, by reason of the unauthorized outage of the Miocene Canal, Pacific alone became obligated to supply emergency, auxiliary, or stand-by water during said outage; and that the District and the Water Company were entitled to recover from appellant Pacific the net amounts expended by them under the stipulation, with interest.

The judgment is affirmed.

Adams, P. J., and Van Dyke, J., concurred.