[Sac. No. 6309. In Bank. Feb. 20, 1953.]

THOMAS S. WHALEN, Appellant, v. AL RUIZ et al., Defendants; SOUTHERN PACIFIC COMPANY (a Corporation) et al., Respondents.

Mull & Pierce, A. M. Mull, Jr., Fred Pierce and Benjamin H. Brown for Appellant.

Devlin, Diepenbrock & Wulff and Horace B. Wulff for Respondents.

SPENCE, J.—This case presents the question of the liability, if any, of a railroad company for failure to make structural changes to meet changing traffic conditions on the highway deck of a bridge, which bridge is owned and operated and which highway deck was used as a public highway under the terms of an agreement with the public authorities.

Plaintiff sought damages for injuries sustained by him when an autobus, in which he and other farm laborers were riding, ran off the highway deck of the "I" Street bridge over the Sacramento River at Sacramento and crashed to the ground below. Plaintiff alleged negligence against defendant railroad in the maintenance of the bridge and against defendant Al Ruiz in operation of the bus. Defendant Frank King was sued as owner of the bus and as employer of the driver Ruiz. The trial court found that the accident occurred as the "proximate and contributing result" of negligent operation of the bus by the driver, as employee of defendant King, and negligent maintenance of the overhead structure of the bridge; that defendant railroad was the owner and operator of the bridge; that construction of the overhead or roadway portion of the bridge was controlled by an agreement dated September 6, 1910, executed by the railroad and the counties of Sacramento and Yolo, whereby the railroad granted to the counties the "right, easement and privilege of using the overhead structure and approaches thereto for highway purposes and for the life of the bridge for railroad purposes"; that the agreement also provided that the railroad would "repair, police and operate" the overhead structure and approaches thereto but that it "did not include any obligation" on the part of the "Railroad Company, or any other defendant herein, to do more than to maintain said structure according to the design and plan under which said bridge was originally built and that there was no obligation . . . to make structural changes to meet changing traffic conditions." It was also found that the overhead structure and approaches thereto were part of the state highway system; that plaintiff was the employee of defendant King and engaged in the course of his employment when injured; and that both were subject

to the Workmen's Compensation Act. From such findings the court concluded that plaintiff's sole remedy against defendant King was within the jurisdiction of the Industrial Accident Commission, and that the court had no jurisdiction; and further, that plaintiff should take nothing by his complaint. Accordingly, judgment was entered in favor of all defendants. Plaintiff appeals from that portion of the judgment which decrees that he take nothing against the railroad.

The original construction of the bridge and overhead structure, as completed in 1912, is conceded to have been proper. However, appellant claims that with the increased use of motor vehicle travel, respondent was negligent in failing to maintain an adequate guardrail and curbing along the edge of the pavement on the overhead highway deck of the bridge. At the time of the accident, September 6, 1947, the roadway was equipped with an 8-inch curb and an iron railing, as provided in the original specifications. But this is not a case where the common-law principle of tort liability applies against respondent incident to a duty to maintain the highway deck of the bridge in a reasonably safe condition for use by the traveling public at its express or implied invitation. (*Comstock* v. *Great Northern Ry. Co.*, 157 Minn. 345 [196 N.W. 177]; *Calley* v. *Boston & Maine R. R.*, 93 N.H. 359 [42 A.2d 329, 159 A.L.R. 115].) Rather the controlling factor is the mentioned agreement of 1910 fixing the rights and obligations of the parties thereto with regard to the bridge and overhead structure We have concluded that the trial court properly construed the terms of said agreement as not imposing on respondent the obligation to make structural changes on the highway deck of the bridge to conform to changing traffic needs and modes of travel.

The 1910 agreement provided for respondent's construction of a double track bridge, with an overhead structure for highway purposes, connecting the counties of Yolo and Sacramento and extending over the Sacramento River. It recited that the new structure was to replace an existing bridge and overhead span which had been used in part for highway purposes and which were then out of repair. The cost of the new bridge was specified as $786,000, of which the estimate for the overhead deck and approaches thereto was $160,671. By the agreement respondent leased the overhead deck to Sacramento County for a period from the completion of the bridge until December 15, 1916, after which time said county was to (and did) receive a grant of the "right, ease-

ment and privilege of using the overhead structure and approaches thereto'' for the life of the bridge. For the portion of the bridge located in Yolo County, respondent granted an identical easement to that county, also continuing for the life of the bridge. The enjoyment of such easement and privilege of use was not to ''be interfered with'' by respondent unless the county was in default in some term of the agreement. The agreement further provided that until December 15, 1916 (the termination of the lease to Sacramento County), respondent would ''keep in repair, operate and police at its own expense, the said bridge, including the floor of the overhead structure and the walks and railings thereon'' but after said date, during the life of the bridge, it would ''keep in repair and operate all of said bridge, except the overhead structure and approaches thereto.'' To this point of exception, the agreement continued: ''Whereas, it is recognized that after December 15th, 1916, the keeping in repair, operation and policing of the overhead structure, and approaches thereto, is properly chargeable to the said Counties of Sacramento and Yolo, and said Counties desire that the said 'Company' should agree to keep in repair and operate and police the same, as it is more convenient for the 'Company' to do so, Now, Therefore, the said 'Company' agrees to keep in repair, operate and police the said overhead structure, and approaches thereto, after December 15th, 1916, and during the life of said bridge for railroad purposes, and in consideration thereof'' Sacramento County was to pay $1,500 per year and Yolo County, $500 per year; and, ''if for any reason, any payment . . . shall not be made . . . said Company . . . shall not be further obligated to keep in repair, or operate, or police said overhead structure, and the approaches thereto.''

It is plain from the agreement that the respective counties were granted an exclusive right of way or easement over the highway deck of the bridge. Admittedly the highway deck and approaches thereto were built according to the agreed plans and specifications, and they were then in a safe and proper condition for use of the existing traffic. ▮ Respondent, as owner of the servient tenement, did not become obligated by the mere grant of the easement to maintain the easement in a safe condition for the protection of those using it at the invitation of the easement owners, the two counties. (9 Cal.Jur., § 8, p. 954; *Linton* v. *Miller & Lux, Inc.*, 83 Cal.App. 481, 484 [257 P. 105] ; see, also, Rest.,

Torts, § 349.) ■ The constructed curb and railing on the highway deck of the bridge formed a part of the subject matter of the easement, and it was not incumbent upon respondent to alter these structural features of the roadway or substitute others therefor to accommodate the changing needs of public travel according to future development, in the absence of an agreement devolving such duty upon respondent as owner of the servient tenement. (28 C.J.S. "Easements," § 72, p. 750; § 94, p. 773; *Carson* v. *Jackson Land & Min. Co.*, 90 W.Va. 781 [111 S.E. 846, 847].)

By the agreement of 1910 respondent had the obligation to "keep in repair, operate and police" the overhead structure of the bridge. The agreement recognized that after the effective date of the easement to Sacramento County (December 15, 1916, upon termination of its lease arrangement with respondent), such obligation was properly chargeable to the counties as owners of the easement (*Crease* v. *Jarrell*, 65 Cal.App. 554, 559 [224 P. 762]), but as a matter of convenience, respondent was made responsible for the performance of this work in return for an annual payment by the counties. This contractual undertaking must be examined as fixed by the contracting parties.

■ It does not appear that respondent's obligation to "keep in repair, operate and police" the highway deck of the bridge contemplated the making of structural changes thereon. The word "repair" in its ordinary sense relates to the preservation of property in its original condition, and does not carry the connotation that a new thing should be made or a distinct entity created. (76 C.J.S. p. 1169.) As was said in *Realty & Rebuilding Co.* v. *Rea*, 184 Cal. 565, at page 576 [194 P. 1024]: "To repair means to mend an old thing, not to make a new thing; to restore to a sound state something which has become partially dilapidated, not to create something which has no existence." (See, also, *Santa Cruz Rock Pavement Co.* v. *Broderick*, 113 Cal. 628, 633 [45 P. 863].) Appellant cites *Bosqui* v. *City of San Bernardino*, 2 Cal.2d 747 [43 P.2d 547], where the railroad's duty to "keep in repair" was likened to the "duty to maintain." But under the facts there involved, no broader definition was thereby contemplated. There the duty "related to the structure itself," a viaduct, including the "duty to repair or replace weakened or worn portions" thereof, and the railroad was held liable when the viaduct was allowed to "fail or decline" and injury was sustained as the result of certain

splinters projecting from its worn and dilapidated wooden curbings. (P. 758.) There the failure to repair was a failure to keep the curbings in their original condition. Consistent with such definition of the word "repair," respondent had the duty to keep the overhead structure at the "standard of efficiency" it had according to the design and plan under which it was originally constructed, but not to make structural changes to meet developing exigencies of traffic over the years. (See *In re Morris Ave. Bridge,* 105 Misc. 659 [174 N.Y.S. 682, 683].)

⬛ Moreover, the parties did not interpret their agreement as imposing upon respondent the duty to make structural changes in the highway deck of the bridge. Respondent's division engineer testified that, in his 30 years' experience with respondent, he knew it to "have at various times made repairs to the overhead structure . . . when the railing becomes broken . . . [and] restore it to its original condition" but the "railroad . . . . made no structural changes." The counties acquiesced in this interpretation of the agreement and never made "any demand" upon respondent "to alter the nature of the construction or the construction features of the bridge." He further testified that such "structural changes or alterations" as were made were done by the state, twice with respondent's consent and once without. ⬛ The "construction given the contract by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight and will, when reasonable, be adopted and enforced by the courts." (*Woodbine* v. *Van Horn,* 29 Cal.2d 95, 104 [173 P.2d 17]; *Gillespie* v. *City of Los Angeles,* 36 Cal.2d 553, 561 [225 P.2d 522]; *Trottier* v. *M. H. Golden Construction Co.,* 105 Cal.App. 2d 511, 516 [233 P.2d 675].) ⬛ Here the construction placed by the parties upon their agreement is not only reasonable, but a contrary construction would not reflect the ordinary meaning of the language used. (Civ. Code, § 1644.)

⬛ Nor do the words "operate and police" place upon respondent the duty to make structural changes on the overhead structure. Built across the Sacramento River, the bridge is a drawbridge constructed so as to allow the passage of river navigation. Normally the word "operate" when used in connection with machinery or something that moves, as here the drawbridge, means to "put in action and supervise the working of," to "run." (67 C.J.S. p. 502; see *Gallenkamp* v. *Garvin Mach. Co.,* 91 App.Div. 141 [86 N.Y.S. 378, 384],

179 N.Y. 588 [72 N.E. 1142].) ■ Respondent's division engineer testified that over the years of the agreement, respondent's operation of the bridge had been confined exclusively to "operation of the draw span." Such procedure indicates the parties' practical construction of their agreement in reference to respondent's operation of the mechanism which controlled the movable part of the bridge. As to the purport of respondent's "policing obligation," the same witness testified that it related to respondent's closing of the gates when the bridge was about to open and stopping traffic before he gates were closed; also sweeping and removing rubbish from the upper deck. The construction the parties placed on their agreement extending over some 35 years is entitled to great weight in the solution of any difficulty as to the meaning of the language used. (*Mitau* v. *Roddan,* 149 Cal. 1, 14 [84 P. 145, 6 L.R.A.N.S. 275] ; *Thermalito Irr. Dist.* v. *California Water S. Co.,* 108 Cal.App.2d 329, 341 [239 P.2d 109].)

It is fair to assume that had the parties intended to impose the sweeping obligation on respondent to make such structural changes in the highway deck of the bridge as would keep it reasonably safe for ever changing traffic conditions, some mention thereof would have been made in their agreement. But no such provision appears and respondent, in its unconditional grant of the easement to the counties for use of the highway deck, reserved no right to interfere therewith for the purpose of making alterations or structural improvements. Under the circumstances the parties presumably intended the California law declaring the rights and obligations flowing from the grant of an easement to be applicable.

■ Section 806 of the Civil Code provides that the extent of a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired; and it is well settled that "both parties have the right to insist that so long as the easement is enjoyed it shall remain substantially the same as it was at the time the right accrued, entirely regardless of the question as to the relative benefit and damage that would ensue to the parties by reason of a change in the mode and manner of its enjoyment." (*Allen* v. *San Jose Land & Water Co.,* 92 Cal. 138, 141 [28 P. 215, 15 L.R.A. 93] ; see *Hannah* v. *Pogue,* 23 Cal.2d 849, 854 [147 P.2d 572].)

■ The record shows that such structural changes as were made on the overhead structure from time to time were done by the state and at its expense. The first of such changes was in pursuance of an agreement of March 23, 1934, to which

the state, the counties and respondent were parties. Thereby the state undertook to make all necessary changes in the overhead structure—"said work consisting of widening of the pavement for vehicular traffic, reconstruction of sidewalks, shifting of railings and lighting standards, and shifting curbs in locations shown" on the specifications—as would facilitate its use as a detour during the construction of the new "M" Street bridge. It was also agreed thereby that the state would "maintain the roadway of [the] overhead structure and approaches at its expense, and in the event conditions due to increased traffic require additional policing to properly maintain and safeguard traffic during the period of detour State shall assume the entire cost thereof."

This 1934 agreement demonstrates that the state had knowledge of the 1910 agreement between respondent and the counties as to the nature of the easement granted and secured their consent before undertaking to alter the manner of its use and enjoyment. (Civ. Code, § 806.) Moreover, two subsequent structural changes were made on the overhead structure by the state and at its expense. Having knowledge of the 1910 agreement, the state would not have voluntarily undertaken to make such structural improvements if any such duty were imposed on the parties to the said agreement. Rather the state's action coincided with its statutory duty in reference to the roadway running across the overhead structure as constituting a traversable state highway. (Stats. 1933, ch. 767, § 7.)

Section 100 of the Streets and Highways Code, enacted in 1935 and in effect at the time of the accident in question, provided: "The [state] department [of public works] shall have *full possession and control* of all State highways. The department is authorized and directed . . . to *improve and maintain* such highways as provided in this code. . . . The department may do any act *necessary or proper* for the construction, *improvement, maintenance or control* of all highways and properties which are under its control. . . ." (Emphasis added.) Section 27 of the same code defines maintenance to include "(b) The necessary provision for special safety conveniences and devices" and further provides: "*The degree and type of maintenance* for each highway . . . shall be determined" by the state agency. Under these provisions the state, not respondent, would have authority to make structural changes in the highway deck of the bridge and would be chargeable with the undertaking of appropriate

safety measures pursuant to its maintenance of the state highway system. (*Gillespie* v. *City of Los Angeles, supra,* 36 Cal. 2d 553, 557-558.)

In view of these observations, the trial court's exoneration of respondent from liability is fully sustained by the record. Neither by express provision nor as practically construed by the parties did the controlling 1910 agreement impose upon respondent an obligation to make structural changes on the highway deck of the bridge to conform with changing traffic needs, but rather all changes of that character proceeded at the instance and cost of the state pursuant to. its statutory duty. Having neither obligation nor authority to make structural changes in the highway deck of its bridge, respondent is not chargeable with responsibility for the happening of the accident here involved.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., and Schauer, J., concurred.

CARTER, J.—The majority opinion holds that since an easement was granted by the railroad company to the counties to use the bridge for road purposes, the company was under no obligation to keep the bridge in a safe condition. The whole tenor of the 1910 agreement and other factors points to at least joint control of the roadway part of the bridge by the railroad company and the counties.

The 1910 agreement stated that it was made under statutory authority. (Stats. 1907, p. 982.) That statute authorizes agreements between counties and private persons for the acquisition and maintenance of bridges. Such an agreement shall provide for the "joint use" of a bridge by the parties and it shall be referred to as a "joint" bridge. With that statutory base the obvious purpose of the 1910 contract was that the bridge was to be "jointly" used and hence "jointly" owned and controlled by the railroad company and the counties.

The 1910 contract, after referring to the easement to be granted to the counties, provides that the railroad company (after 1916) shall, for a stated sum, "keep in repair and operate and police" the road portion of the bridge. Why was that undertaken by the company? This question is answered by the contract as it states, immediately preceding the covenant to repair and operate, as follows: "Whereas, it

is *recognized*'' (emphasis added) that after 1916, the up-keep is chargeable to the counties but the counties desire that the railroad company should agree ''to keep in repair and operate the same, as it is *more convenient* for the [company] to do so.'' (Emphasis added.) This clearly shows that the railroad company should continue as before—have *control* of the bridge including the roadway and be in charge of its maintenance; that although the counties may, in a technical sense, have an easement for a roadway over the bridge, the railroad company still had joint control and obligated itself to do anything the counties would be required to do with reference to keeping the bridge safe.

This thought was further indicated by the 1934 contract between the counties, state, and the railroad company, in which the state was authorized to make some improvements in the road part of the bridge. If the railroad company no longer had *any* control or interest in the road part of the bridge by reason of the easement granted to the counties, there would have been no occasion for it to be a party to that contract and consent to the improvements. It is recited in that contract that the *railroad company* and the counties are willing to permit the state to make the improvements on specified conditions however. The conditions are, among others, that the work must be performed to the *satisfaction* of the *railroad company*; that during the time the bridge is being used by the state for detour purposes the state shall *maintain* the road portion at its expense, and if traffic conditions require additional policing during that time the state shall furnish same, all of which indicates that the state was assuming that which was the duty of the railroad company; and finally that all the terms of the 1910 contract shall remain in force, that is, shall become revitalized from thenceforth, although the traffic conditions and requirements to keep the bridge safe had vastly increased in 1934 from those existing when the 1910 contract was made.

The only reasonable conclusion from these factors is that the words ''repair,'' ''operate'' and ''police'' were not used in a narrow sense; that the railroad company retained at least joint control of the road part of the bridge and was obligated to maintain it in a safe condition.

Reliance is placed by the majority on the testimony of the railroad company's division engineer that the company had made no structural changes in the road part of the bridge for 30 years and the counties never made demand for any.

The complete answer to this argument is that it does not appear that the counties were apprised that any changes were necessary.

The words "operate" and "repair" must be defined according to the context in which they were used. The thing to be maintained was a roadway. The counties would be concerned with only one thing, namely, that the bridge be kept safe for those who used it, the travelling public. "Operate" means to have control of (*State* v. *Thomason,* 224 Iowa 499 [276 N.W. 619]; *Booth* v. *State,* 179 Ind. 405 [100 N.E. 563, Ann.Cas. 1915D 987, L.R.A. 1915B 420]; *Southern Ry. Co.* v. *Flynt,* 203 Ala. 65 [82 So. 25]; *Bosse* v. *Marye,* 80 Cal. App. 109 [250 P. 693]) and includes doing so safely. (*McKim* v. *City of Philadelphia,* 217 Pa. 243 [66 A. 340].) "To repair the *roads* in question means to make them over, not necessarily exactly like they were before, nor in exact accord with the original plans, but, utilizing the work done in constructing the roads originally under the original plans, make them over with such material for resurfacing *as experience and advance in the science of road building teach* will be the best and the most economical in the long run, thereby giving the landowners value received for their investment." (*Cowan* v. *Thompson,* 178 Ark. 44 [9 S.W.2d 790, 792].) (Emphasis added.) The obligation to repair was to run indefinitely in the future, thus contemplating that future conditions must be considered in determining what would be necessary to do to keep the road portion in repair. Those conditions thus include changes in traffic conditions and also methods of operation which may produce the necessity for extensive repairs. The obligation to make such repairs was placed on the railroad company by the 1910 agreement and continued in force until the happening of the accident here involved. Since the court found that the unsafe condition of the roadway on the bridge was a proximate cause of the accident, the liability of the railroad company was established.

I would therefore reverse the judgment.