[Civ. No. 25158. Second Dist., Div. Two. Dec. 29, 1961.]

F. GLADE WALL et al., Plaintiffs and Appellants, v. MAX RUDOLPH et al., Defendants and Respondents.

Pray, Price & Williams, James C. Hollingsworth and Henry F. Walker for Plaintiffs and Appellants.

Sheridan, Orr, Barnes, Duval & Benton for Defendants and Respondents.

ASHBURN, J.—Plaintiffs Wall and James appeal from an adverse judgment in an action brought for an injunction, declaratory judgment and other relief with respect to certain private roads in the South Mountain area of Ventura County. The lands in question lie immediately south of the Santa Clara River and south and southwesterly of the City of Santa Paula; they are somewhat level along the river and mountain-

ous to the south.[1] Respondents' counsel say that this is "an extremely complicated" case and we add, a perplexing one. A careful study of the record[2] discloses as the major legal question that of excessively burdensome use of existing easements sufficient to warrant and require an injunction.

"A principle which underlies the use of all easements is that the owner of an easement cannot materially increase the burden of it upon the servient estate or impose thereon a new and additional burden." (17A Am.Jur. § 115, p. 723.)

Prior to October 1956, the properties involved in the action —those of plaintiffs Wall and James and defendants Lamb and Hill—had been used for citrus growing, general ranching, cattle ranching and occasional oil drilling which mostly resulted in dry wells. The roads over which easements are claimed have various designations but are usually referred to in the record as A, B and C, respectively. Road A, commonly known as South Mountain Road, starts at plaintiff Wall's easterly boundary line and runs west to the "Lamb turnoff" road at a large rock with a cross on it, which is marked Point B on our diagram; continuing westerly from that point the same road (now known as Road B) extends to the easterly boundary of the Converse Cattle Ranch (presently owned by defendants Hill; Mrs. Hill was formerly Mrs. Converse). Road C, the Lamb turnoff road, originally extended southerly from Point B to Point A on the boundary between Lamb (1) and Lamb (2) of our diagram.

Road A, a public road, was formally abandoned by the county in 1941, thereupon reverting to the adjoining fee owners. The court found that defendants Lamb and Hill own easements over this strip of land, which is still used as a road, and appellants make no attack upon the finding except as to the extent of the burden of the easement.

As to Road B the finding is that defendants Hill have easements to use same across lands of plaintiffs Wall and James. As to plaintiff James' property the finding is that the Hills have an easement over his triangle, James (2), which

---

[1]We have adjusted the compass to suit our own convenience, as counsel have done.

[2]We have concluded that the facts cannot be made understandable without the use of a map or diagram. Accordingly, we are inserting herein a diagram (not an exhibit) which is incorporated in appellants' opening brief and has been of considerable assistance to us, as has another unofficial drawing included in respondents' brief. (See opposite page.)

is limited to use for any and all general domestic and farm purposes. Appellants make no complaint concerning this latter finding.

Road C. Appellants concede that the Lambs have an easement across plaintiff Wall's property on this Road C; this by virtue of a gratuitous grant from Wall to Lamb of June 18, 1956,—"a 20' easement for road purposes generally described as follows: [Road C]."

As to Hills, the evidence seems sufficiently contradictory to require us to accept as established the fact that they, as successors to Converse, have an easement over Lamb (2) and Lamb (1) and Road C across the Wall property.

One Hobson was the owner in 1907 of a large tract which includes the present Hill and Lamb properties. Hobson and

wife conveyed to South Mountain Lemon Company all property on the south side of Roads A and B within the dotted lines shown on our diagram, which includes Lamb (1) but not Lamb (2); they excepted and reserved to themselves, "their successors and assigns, a right of way, ample for wagon travel" between Points A and B "provided said right of way shall not be used for the driving of loose stock or cattle." It is to be noted that the Lemon Company thereby acquired Lamb (1) but not Lamb (2).

As to Road B, South Mountain Lemon Company on December 19, 1941, granted Mrs. Converse (Hill) a 30-foot easement "over and across the existing road approximately thirty feet wide," extending from the westerly terminus of the South Mountain Road (approximately Point B) to the easterly terminus of the "Converse Road." The grantee agreed "that the location of the said easement may be changed to such other road as may be established from time to time in place of the said road now existing."

The trial court held each of the easements over Roads A, B and C to be a "general and unrestricted easement consisting of rights of way for themselves, their lessees and tenants, and for their respective agents, employees, servants, guests, business visitors and invitees, for automobiles, trucks and other traffic over and upon all portions of [each of said roads] included within the boundaries of any of the lands of plaintiffs described herein, together with the rights to keep and maintain all such portions of said road in good condition and repair."

It was also found that "Defendants Max Rudolph, Benjamin Hill, Estella Converse Hill, Clarence R. Lamb and Bertha E. Lamb have, since October, 1956, established certain sumps or dumping grounds for oil well and oil field waste upon the property hereinafter described, owned by defendants Benjamin Hill and Estella Converse Hill, and upon the property hereinafter described owned by Clarence R. Lamb and Bertha E. Lamb, in the near proximity of the properties described in plaintiffs' complaint. In the use of said sumps or dumping grounds, the defendants Max Rudolph [et al.] have each operated heavy tank trucks and trucking equipment over said Roads A and C, to transport the waste and materials to be dumped. Fluid waste from said sumps is pumped to a sump located upon the property hereinafter described of Benjamin Hill and Estella Converse Hill, and upon adjoining property in the general area owned by defendants John R. Milligan and Berniece P. Milligan. . . . [I]t is true that

defendants intend to continue to operate trucks over said Roads A and C and intend to operate trucks for farm and domestic purposes over Road B." Also: "Defendant Max Rudolph is and at all times mentioned in plaintiffs' complaint was a lessee of defendants Benjamin Hill, Estella Converse Hill, Clarence R. Lamb and Bertha E. Lamb in possession of the waste disposal sumps hereinabove mentioned. At all of said times the defendants J & G Oil Well Service Corp., Coastal Vacuum Service, Inc., Thomas A. Smith, Mary Ellen Smith, Grace N. Barnett and Ventura Transfer Company, Inc. were and now are using said Roads A and C as the business visitors and invitees of defendants Benjamin Hill, Estella Converse Hill, Clarence R. Lamb, Bertha E. Lamb and Max Rudolph, and of each of them, for the purpose of running trucks and trucking equipment to and from the waste disposal sumps located upon the lands of defendants Benjamin Hill, Estella Converse Hill, Clarence R. Lamb and Bertha E. Lamb.

"The operation of trucks and trucking equipment complained of by plaintiffs in their complaint is and at all times therein mentioned was upon said Roads A and C.

"Those portions of Roads A, B and C located within the boundaries of any of the lands described in Paragraphs II and III of these findings as belonging to any of the plaintiffs are not public roads."

The evidence discloses that the properties here involved comprised a quiet area devoted to rural pursuits until the building or operation of the first sump. Then, as plaintiff James phrased it, the traffic became "terrific." Counsel stipulated that "this was a commercial venture, this sump operation was a commercial business venture in which Mr. Rudolph, as lessee, invited people to dump oil field waste in the sump area," adding the words, "for which Mr. Rudolph was making a charge."

Defendant Lamb in September or October, 1956, made a written agreement with defendant Rudolph leasing to him at a rental of $150 a month and for a period of 10 years a certain portion of his property for the purpose of construction, creation, maintenance of an oil field waste sump. Same having been built, defendant Hill discovered it was partly on his land and he exacted payment of $125 a month and entered into a similar arrangement with Rudolph. The record does not disclose the exact location of the sumps but the first one was somewhere on the boundary between parcels marked

"Lamb (2)" and "Hill" on our diagram; the other one is somewhere outside the area shown thereon.

Prior to the time of building the sumps Hill had used the various roads for transportation of ranch supplies, ranch produce, cattle, and smudge oil for his ranch. Lamb bought his property in 1951 or 1952 and had used Road C for farming purposes, tradesmen's visits and social visitors. Plaintiff Wall had his property in lemons and used the Converse Road (B) and the Lamb turnoff (C), only for farming and "to serve transportation to the blocks of ground." Plaintiff James used Road B to serve his ranch property which was in lemons, and other people in the vicinity used it to get to and from their homes. Such occasional use of these roads as was made by oil companies was of a periodic and temporary nature.[3]

As soon as Rudolph had built his sump and invited the public to use it an immense truck traffic sprang up on Roads A and C consisting largely of vacuum trucks capable of carrying 125 barrels of sludge. Prior to that time no vacuum trucks had been used by Rudolph over Wall land or James land or the Lemon Company road. In late 1957 or early 1958 Wall's foreman saw 150 trucks using Road A in a 24-hour period (going both ways). Wall himself counted 35 trucks in three hours. James watched 50 to 100 vacuum trucks using Road A in a 10-hour period. The traffic grew rapidly and soon the first sump was full or nearly so. Defendants Hill, Lamb, Milligan and Rudolph devised a new

---

[3]The trial judge's memorandum of opinion (filed herein by way of augmentation) says at page 13: "So far as the Lamb road is concerned . . . [t]here was some early use by oil companies, but so far as I can tell from the evidence this operation may have been on land owned by Hobson or Converse. . . . Also, the evidence indicates that after Fairfield came on the scene, in approximately 1943 . . . the road was no longer used by the oil companies as a means of access to land beyond the Lamb house. Lamb testified that after he bought the property there was little or no use of the road past his house."

The evidence consists of the following: Santa Paula Home Oil Company drilled on Hobson property at an undisclosed location a dry well which was abandoned in 1902. A Munding-Bell well was drilled back of the Lamb house around 1906 to 1910 but stopped without reaching oil. Honolulu Oil Company drilled on Lemon Company property, using the "Hobson road" but abandoned the well; then Fairfield took it over about 1943, drilled another well and serviced the wells over the "Fairfield road"; nobody used the Hobson road for a long time before the Lemon Company sold out. Ring Oil Company drilled in 1928 to 1930 using the "Hobson road" and abandoned the well in 1930. In 1935 or 1936 Honolulu Oil Company drilled a well on Lemon Company property and in 1937 or 1938 another one which proved to be a dry hole. In 1940 to 1941 Richfield Oil Corporation drilled on Lemon Company land now owned by plaintiff Wall but not acquired by him until

plan pursuant to which a parcel of land on top of South Mountain was acquired by Hill and Milligan for a second sump. The process thereafter pursued was to separate the mud on sump 1 property and to pump the salt water to sump 2 on the top of the hill. In January 1958, Hill and Milligan leased the last mentioned site to Rudolph for sump purposes, each to receive 25 per cent of his gross receipts. Roads A and C were used for this traffic which continued to increase; inferentially it came wholly or mostly from wells outside the area in which the property of the litigants is situated. The sumps operated 24 hours a day from October, 1956 to time of trial, in numbers estimated by Rudolph at 150 to 200 trucks per day. His estimate of the 1957 total was 3,000 barrels a day, and in 1958 was 7,000 barrels a day. This action was filed on March 4, 1958, and Rudolph thereafter talked to the vacuum truckers and the volume fell off to five or six trucks a day during the last three months before trial (July 27, 1959). But this use has not ceased as to Road A or Road C. Defendants claim the right to continue it without consent of plaintiffs and assert an intention so to do. The court found "that defendants intend to continue to operate trucks over said Roads A and C and intend to operate trucks for farm and domestic purposes over Road B." At the trial the judge expressed the view found in the following colloquy: "MR. HENDERSON: I was going to make this statement, if I may, it shows a basis for the inference that the trespass, if any, is now very slight, or minimal, it [sic] it be a trespass. MR.

---

1946 or 1948; the company used Road A and a portion of Road B for that purpose; Wall did not acquire any of the mineral rights.

In 1957 (after the sump operations started) two wells were drilled on Wall property and in 1958 two more were sunk. Two of these well-sites bracketed the turnoff of Road C from Road A. Another well was drilled on Wall near the Lamb property and Road C used for that purpose; this was in the year 1958. Most, if not all, of the wells in the Wall property are in parcels bordering on Road A or Road B. In 1958 or 1959 two wells were drilled on Hill property west of the Lamb turnoff, but Mr. Hill testified that the drilling company did not use Road C, did use the road going "westerly of the Lamb turnoff," which must mean Road B; this was done under leave obtained by Union Oil Company from Wall and James in consideration of $3,500 paid to the former and $1,500 to the latter. Shell Oil Company drilled some wells on Wall (5) and the James (2) triangle, but there is no showing that any of the roads A, B and C were used for this drilling; these Wall wells were on property "down in the river," meaning Wall (5), which would imply use of the river road which afforded access to the Converse Ranch prior to 1935. Four wells have been drilled on James property since 1956 but none of the roads in question were used therefor.

PRICE: But that is no assurance—THE COURT: It makes no difference as long as the claimed right is here because it might be increased in the future. MR. PRICE: Right."

Whether the user just described is excessive, unduly burdensome, depends primarily upon the terms of each grant construed in the light of circumstances surrounding its execution (Civ. Code §§ 1066, 1647) where, as here, there is room for doubt as to the proper interpretation. (*Barham* v. *Barham*, 33 Cal.2d 416, 422 [202 P.2d 289]; *Berg Metals Corp.* v. *Wilson*, 170 Cal.App.2d 559, 568 [339 P.2d 869].) ■ The grants here under consideration were made for road purposes in broad terms. It has been held that such phrasing creates " 'a general right of way capable of use in connection with the dominant tenement for all reasonable purposes.' " (*Laux* v. *Freed*, 53 Cal.2d 512, 525 [2 Cal.Rptr. 265, 348 P.2d 873].) *City of Pasadena* v. *California-Michigan etc. Co.*, 17 Cal.2d 576, 582 [110 P.2d 983, 133 A.L.R. 1186], holds such a right to be one of use "limited only by the requirement that it be reasonably necessary and consistent with the purposes for which the easement was granted." (To the same effect see 17 Cal.Jur.2d § 10, p. 102; 28 C.J.S. § 73, p. 751, and § 87, p. 766.) This reasonable contemplation presumptively includes normal future development within the scope of the basic purpose (see *C. F. Lott Land Co.* v. *Hegan*, 177 Cal. 169, 173 [169 P. 1035]; *Fristoe* v. *Drapeau*, 35 Cal.2d 5, 9 [215 P.2d 729]; 17A Am.Jur. § 115, p. 723), but not an abnormal development, one which actually increases the burden upon the servient tenement (Rest., Law of Property, § 484, illus. 3, p. 3021).

In *Winslow* v. *City of Vallejo*, 148 Cal. 723, 727 [84 P. 191, 113 Am.St.Rep. 349, 7 Ann.Cas. 851, 5 L.R.A. N.S. 851], it is said: "It is true, as urged by appellant, that the parties to the grant knew that the right of way granted was for the purposes of a municipal water supply, and they may have contemplated that with the growth of the city, additional means of conducting water to it might be necessary. It by no means follows, however, that the grantors, in conveying a right of way for water-pipes over their land, intended to burden that land with an easement the extent of which could never be definitely ascertainable, and which might be enlarged again and again, as often as the growth of the city of Vallejo might make it necessary to extend the operations of the water plant."

*Hewitt* v. *Perry,* 309 Mass. 100 [34 N.E.2d 489], well illustrates the principle. That case dealt with a " 'right of way for all purposes over the streets and ways indicated on said plan, and together with the right to use so much of the beach on Plum Island shown on said plan as is owned by the Company for the purpose of boating, bathing, fishing and other recreation.' " (P. 490 [34 N.E.2d].) At page 491 [34 N.E. 2d] the court said: "The easement to use the beach 'for the purpose of boating, bathing, fishing and other recreation' was made appurtenant to lots evidently intended for summer residences. The extent of the easement is determined 'by the language of the grant, construed in the light of the attending circumstances.' [Citations.] It is true that an easement granted in general and unrestricted terms is not limited to the uses made of the dominant estate at the time of its creation, but is available for the reasonable uses to which the dominant estate may be devoted. . . . But we think that the maintenance on the triangular piece of a substantial commercial business in letting boats to the general public surcharged the easement granted, and should be restrained by injunction upon the counterclaim of the defendant."

*Swensen* v. *Marino,* 306 Mass. 582 [29 N.E.2d 15, 130 A.L.R. 763], holds first: "Since it is the defendant who relies upon the easement, the burden rests upon him to show that his right is extensive enough to authorize the amount and character of the use which he has made of the way." (P. 17 [29 N.E.2d].) The case involved a right of way over plaintiff's land to Franklin Street. For some years it had been used for teaming cord wood and fence posts, but the use was intermittent and generally infrequent except when cord wood was being cut and carted off. After defendant purchased the dominant tenement he widened the way and by the time suit was brought 30 to 40 trucks of sand and gravel were passing over it, making from 60 to 80 trips out and in. The court said, at page 17 [29 N.E.2d] : "It is true that the defendant has established the existence of an easement in his favor which seems on the findings not to have been confined to use for any specified purpose or purposes, but within reasonable limits may be inferred to have comprehended general use as a way for purposes compatible with the nature of a tract of woodland separated from the public road, but subject to the limitations found by the master. We are not prepared to say that the defendant cannot haul out any sand or gravel, but on the

findings the defendant's present use of the way for the carrying on of a practically continuous business of mining sand and gravel on the wood lot exceeds any privilege shown to have been acquired, amounts to a new servitude, and overloads the easement.''

*Hoosier Stone Co.* v. *Malott*, 130 Ind. 21 [29 N.E. 412], dealt with a grant of land and an appurtenant easement to construct a line of railway across grantor's remaining land connecting the granted land with a public railway. The grantee, Hoosier Stone Company, constructed the railway and used it for conveying rock quarried upon its own land. It later agreed with others who owned nondominant lands that they might use its line for transportation of their stone. The court affirmed an injunction against the Stone Company and said, in part: ''The way is granted for the benefit of the particular land, and its use is limited to use in connection with the enjoyment of such land. Such a way cannot be converted into a public way without the consent of the grantors, and the grantors have the right to rely on its use being limited to the purpose for which it is granted, — or, in other words its legal use, — and can prevent the use of the way for purposes not authorized. If, as contended by the appellants, the Hoosier Stone Company has the right to sublease or to permit the use of it by its co-appellants for the transportation of the products of the stone-quarry situate upon other lands, it may extend such use to others or permit its use for general public traffic. This would be entirely inconsistent with the rule of law governing the use of private ways.'' (P. 414 [29 N.E. 412].)

California courts have set their faces firmly against such increases in the burden upon the servient tenement. ██ *Whalen* v. *Ruiz*, 40 Cal.2d 294, 302 [253 P.2d 457] : ''Section 806 of the Civil Code provides that the extent of a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired; and it is well settled that 'both parties have the right to insist that so long as the easement is enjoyed it shall remain substantially the same as it was at the time the right accrued, entirely regardless of the question as to the relative benefit and damage that would ensue to the parties by reason of a change in the mode and manner of its enjoyment.' (*Allen* v. *San Jose Land & Water Co.*, 92 Cal. 138, 141 [28 P. 215, 15 L.R.A. 93] ; see *Hannah* v. *Pogue*, 23 Cal.2d 849, 854 [147 P.2d 572].)'' (See *Joseph* v. *Ager*, 108 Cal. 517, 520 [41 P. 422] ; *North Fork Water Co.*

v. *Edwards*, 121 Cal. 662, 667 [54 P. 69]; *Jacob* v. *Day*, 111 Cal. 571, 579 [44 P. 243]; *Winslow* v. *City of Vallejo, supra*, 148 Cal. 723, 727; *Fletcher* v. *Stapleton*, 123 Cal.App. 133, 137 [10 P.2d 1019]; *Goubert* v. *Pomona Valley Water Co.*, 137 Cal.App.2d Supp. 852, 854 [289 P.2d 601]; 17 Cal.Jur.2d § 26, p. 131.) See also *Knotts* v. *Summit Park Co.*, 146 Md. 234 [126 A. 280]; *Norris* v. *Hoffman*, 133 App.Div. 596 [118 N.Y.S. 156, 159], 197 N.Y. 578 [91 N.E. 1118]; *Hammett* v. *Rosensohn*, 26 N.J. 415 [140 A.2d 377, 383-384]; *Lynch* v. *White*, 85 Conn. 326 [84 A. 326, 328]; *McCullough* v. *Broad Exch. Co.*, 101 App.Div. 566 [92 N.Y.S. 533].

 Whatever may be said about the Hill (Converse) property upon which the first or lower sump is partially located, it certainly is true that the top of the hill which defendants Hill and Milligan bought for the purpose of the second sump, —for the furtherance of the stipulated "commercial business venture in which Mr. Rudolph as lessee invited people to dump oil field waste in the sump area . . . for which Mr. Rudolph was making a charge"—is not and never was a dominant tenement with respect to any of the rights of way here under discussion. Rudolph owns no land in the vicinity and his rights, if any, flow from Hill. With respect to Milligan the court found: "Defendants John R. Milligan and Berniece P. Milligan do not, nor does either of them, own any right, title interest or easement in or to the property of plaintiffs described in Paragraphs II and III hereof." It thus appears that sump 2 is on land which is not a dominant tenement with respect to any of plaintiffs' lands.

 Use of an appurtenant easement for the benefit of any property other than the dominant tenement is a violation of the easement because it is an excessive use (*Myers* v. *Berven*, 166 Cal. 484, 489 [137 P. 260]; *Buehler* v. *Reilly*, 157 Cal. App.2d 338, 343-344 [321 P.2d 128]; *Perkins* v. *Jones*, 215 Ky. 189 [284 S.W. 1031]; Jones on Easements § 32, p. 24; 17 Cal.Jur.2d § 26, p. 131; 28 C.J.S. § 92, p. 772; 17A Am. Jur. § 119, p. 728; § 115, p. 723); such use would amount to an increase of burden upon the servient tenement (*Miller* v. *Weingart*, 317 Ill. 179 [147 N.E. 804, 805-806]), and the rule applies "whether the easement is created by grant, reservation, prescription, or implication." (*Cleve* v. *Nairin*, 204 Ky. 342 [264 S.W. 741, 742].)

 Assuming Hill to have an easement over Road B (by virtue of grant of 1941 from the Lemon Company to Converse), that easement does not have any relation to the situs

of sump 2 which in no sense can be a dominant tenement of any properties subject to the rights of way in question.[4]

We thus see that as matter of law there has been an excessive use of easements in burdening them with the heavy public traffic to sump 2.

Ordinarily the question of whether there has been an unreasonable use of an easement is one of fact (*Pasadena* v. *California-Michigan etc. Co., supra,* 17 Cal.2d 576, 579), and that is the situation with respect to sump 1. But the court's findings did not pass upon this vital question.[5] Instead of doing so they ruled that in law each of these easements is a "general and unrestricted easement consisting of rights of way for themselves, their lessees and tenants, and for their respective agents, employees, servants, guests, business visitors and invitees, for automobiles, trucks and other traffic over and upon all portions [of said roads] included within the boundaries of any of the lands of plaintiffs." 3 Powell on Real Property, section 405, page 386, says: "The requirement that

---

[4]Respondents' brief argues: "The situation is similar to a right of way appurtenant to land which is being used for an oilfield tank farm, or upon which a warehouse, depot or pier is located. The use of the dominant tenement is for a tank farm, warehouse or pier; and the fact that the materials collected may later go elsewhere does not compel the conclusion that the right of way is being used for the benefit of other land.

"Here, the Lamb-Hill Sump was being used as a collection and staging point, for temporary storage, separation and disposition of liquids, and for the permanent storage of solids. The Lamb-Hill easements were used only for access to the dominant tenement upon which the entire installation was located."

We cannot subscribe to this doctrine. It has a proper place in problems involving taxation of exports but we think it no part of the law of easements and that the cases hereinbefore discussed or cited establish our position to be correct. Factually there is no substantial basis for the entrepot concept here. All we have are the facts that sump 2 was constructed to handle part of the business which was overwhelming sump 1; ever since No. 2 was constructed the water and mud have been separated on sump 1 property and the water pumped to sump 2 where it is disposed of in some manner. How much, if any, interval of time elapses between the deposit of the sludge at sump 1 and the arrival of the water at sump 2, does not appear, nor is the exact nature of the separation process known to us. But it was stipulated that "this was a commercial venture, this sump operation was a commercial business venture in which Mr. Rudolph, as lessee, invited people to dump oil field waste in the sump area. . . . 'for which Mr. Rudolph was making a charge.' " And defendant Lamb conceded that he and Hill were being paid 50 per cent "for the overall project," "the entire operation there," and that they claim "some interest in the hilltop sump operation as an overall project."

[5]The judge's remarks found in his memorandum concerning reasonable use were not carried into the findings.

the easement involve only a *limited* use or enjoyment of the servient land is a corollary of the nonpossessory character of the interest. If a conveyance purported to transfer to A an *unlimited* use or enjoyment of Blackacre, it would be in effect a conveyance of ownership to A, not of an easement.'' To the same effect is Restatement of the Law of Property, section 471, comment e, page 2964. *Chapman* v. *Newmarket Mfg. Co.*, 74 N.H. 424 [68 A. 868], remarks that ''an unlimited conveyance of an easement is in law a grant of unlimited reasonable use.'' To the same effect is 17A American Jurisprudence, section 113, page 720.

This brings us back to the question of reasonable use which the court did not specifically decide. Plainly, its ruling was that as matter of law this truck use is not excessive because defendants' own easements permit them to make directly or through others whatever use of the roads they see fit to make. This is error of reversible degree.

We are unable to endorse respondents' doctrine that development of an oil field is a reasonable use of a private road over a neighbor's property. It is not permissible to slant drill into his oil pool and we see no reason why one who drills for oil may convert his surface easement for ordinary rural purposes into a heavy traffic which is virtually a public use. If indeed there was an oil field development in 1956, when the heavy vacuum trucks began to use these roads, it was not within the area involved in this case, and the great volume of sludge must have come from elsewhere in the county or state. Certainly, whether the question be treated as one of fact or of law, that sort of user of a country road easement cannot be found to be anything less than an excessive user because of the heavily increased burden imposed upon the servient tenement. This view is fully supported by the *Winslow, Hewitt, Swensen, Hoosier Stone Company, Whalen* and other cases above cited.

Not only do the trucks interfere with cultivation of plaintiff Wall's property but they also, as they pass each other on these narrow roads, pack down the soil; considerable dust is raised which settles on the citrus trees and damages them. More important is the fact that defendants' insistence upon a right to use the easements in furtherance of the over-all sump project will ripen into a valid easement of that scope and hence entitles the plaintiffs as owners of the servient tenements to an injunction as well as an appropriate declaratory judgment. (*Crimmins* v. *Gould*, 149 Cal.App.2d 383, 391 [308

P:2d 786]; *Winslow* v. *City of Vallejo, supra,* 148 Cal. 723, 727-728; 17 Cal.Jur.2d § 50, p. 164.)

This is not a case for instructions to the lower court or for partial reversal.

The judgment is reversed.

Fox, P. J., and Herndon, J., concurred.