[No. C049163. Third Dist. Feb. 24, 2006.]

RODNEY BARNES et al., Plaintiffs, Cross-defendants and Respondents, v. JOHN HUSSA et al., Defendants, Cross-complainants and Appellants.

## COUNSEL

Ellison, Schneider & Harris, Robert E. Donlan, Peter J. Kiel and Jonathan R. Schutz for Defendants, Cross-complainants and Appellants.

Downey Brand, Steven P. Saxton and Robia S. Chang for Plaintiffs, Cross-defendants and Respondents.

## OPINION

**ROBIE, J.**—This case arises out of a dispute over a pipeline used by plaintiffs Rodney and Jan Barnes to divert water from south Deep Creek in Modoc County for use on their nearby ranch, which consists of two noncontiguous parcels known as the Street property and the Tyeryar property. On its way from the creek to the Street property, the pipeline crosses property owned by defendants John and Linda Hussa known as the Vawter property.[1]

After the Barneses extended the pipeline to serve the Tyeryar property as well as the Street property, the Hussas attempted to revoke their permission for the pipeline to cross the Vawter property and tried to dig up the pipeline. The Barneses commenced this action to stop them. In response, the Hussas cross-complained against the Barneses, contending the Barneses were violat-

---

[1] Originally, the defendants were John and Walter Hussa. During the pendency of the proceeding, however, Walter Hussa transferred his interest in the various properties at issue to John and Linda; accordingly, at trial, the court amended the pleadings to insert Linda in Walter's place.

ing a 1934 court decree regarding the rights to the water from Deep Creek by using the pipeline to supply water to the Tyeryar property.

The trial court decided the Barneses have an irrevocable license to continue using the pipeline, the Barneses are not violating the 1934 decree by using the pipeline to convey water to the Tyeryar property, and the Hussas did not prove the Barneses' predecessors forfeited the right to any water that will not fit through the pipeline.

On appeal, the Hussas challenge these conclusions. Finding no error, we will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Deep Creek is a natural stream of water in Modoc County that arises on the eastern slope of the Warner Range and flows eastward into Surprise Valley. Two forks of the creek—north Deep Creek and south Deep Creek—converge near the base of the mountains, south of Cedarville, and from there the creek flows approximately two miles east into Middle Alkali Lake.

This case involves water diverted from south Deep Creek under a court decree from 1934. Because the terms of that decree are central to the issues before us, we pause to describe the decree in some detail.

The 1934 decree identified various parcels of land of various acreage that were irrigated from Deep Creek. Of particular interest here are three parcels known as the Hussa property, the Street property, and the Tyeryar property. The Tyeryar property lies downhill of (but is not contiguous to) the Street property.

The decree allotted between the owners of the various properties around Deep Creek the right to use the natural flow of the creek for domestic, stock watering, and irrigation purposes in various quantities and subject to various priorities, to be diverted at specific diversion points through specific ditches. The quantities allotted the various parties were expressed in cubic feet per second (cfs) and totaled 29.37.

The decree recognized five different priority classes (first through fifth) and generally provided as follows (in paragraph 8): "All allotments hereinabove provided, which are within the same priority class, are equal in priority and correlative in right and at all times when the water supply available for rights within a priority class is inadequate to supply all rights and allotments within

said class, then during the continuance of such shortage, the owners of such allotments shall prorate the available supply, if any, in excess of the quantity required for prior rights, in accordance with their respective allotments for that class, except as otherwise hereinbefore provided."

The dispute in this case involves first priority water diverted from south Deep Creek into the Sharp and Messier Ditch (diversion No. 3) and the Dodson Ditch (diversion No. 4). Under the decree, three owners—Bush, Hussa, and Street—were given the right to divert first priority water at these locations for use on their properties. More specifically, the decree allotted Bush 0.44 cfs, Hussa 1.23 cfs, and Street 3.33 cfs (a total of 5.0 cfs).[2] The decree further provided, however, "that at all times when the flow in South Deep Creek is less than 7.00 cubic feet per second, measured at the head of the Sharp and Messier Ditch then all of such water, or as much thereof as is directly applied to beneficial use, may be diverted by . . . Street, . . . Bush, and . . . Hussa through either the Sharp and Messier Ditch or the Dodson Ditch, said water to be prorated among said . . . Street, . . . Bush, and . . . Hussa in accordance with their respective allotments of first priority class . . . for said Sharp and Messier and Dodson Ditches." In essence, this provision gave Bush 8.8 percent of the flow, Hussa 24.6 percent of the flow, and Street 66.6 percent of the flow in what we will call "low flow" conditions (i.e., when the flow of south Deep Creek at the head of the Sharp and Messier Ditch was less than 7.00 cfs).[3]

The Tyeryar property has no first priority rights to water from Deep Creek under the 1934 decree, but it does have second and third priority rights at various diversion points downstream of diversions Nos. 3 and 4.

The decree further provided that: (1) all allotments were to be measured at their respective points of diversion (paragraph 10); (2) the Division of Water Resources or its successor in the administration of the Water Commission Act was to supervise diversions from Deep Creek through a watermaster "to insure strict adherence to the provisions of this decree" (paragraph 13); and (3) all parties and their successors were "perpetually enjoined and restrained

---

[2] These allotments were "for continuous usage without regard to season."

[3] The Hussas come up with different percentages because in their proration calculation they use 5.4 cfs as "the total of all first priority allotments." This number includes 0.4 cfs of water that Bush was entitled to divert into a different ditch at a different diversion point downstream of diversions Nos. 3 and 4. The 1934 decree, however, specifies that the proration is to be determined by reference to the "respective allotments of first priority class . . . for [the] Sharp and Messier and Dodson Ditches" only. Thus, our calculation, which is based on a total allotment of 5.0 at those diversion points, is the correct one.

from doing anything in violation of the terms or provisions of this decree, or diverting any water from said Deep Creek and its tributaries at any time in violation of the terms hereof, or from doing anything that will obstruct or interfere with any other right in this decree adjudged and decreed" (paragraph 15).

We now jump forward 33 years, to approximately 1967. By that time, the Hussas had acquired a parcel known as the Vawter property, which lies between diversion No. 3 and the Street property. The owner of the Street property at that time obtained permission from the Hussas to install a pipeline (pipeline No. 1) from diversion No. 3, under the Vawter property, to the Street property, to convey water from south Deep Creek that otherwise would be conveyed through the Sharp and Messier Ditch. This pipeline has a carrying capacity of approximately 2.2. to 2.3 cfs—not enough to carry the entire amount of first priority water allotted to the Street property under the 1934 decree.

The Barneses acquired the Tyeryar property in 1986 and then acquired the Street property in 1988. In the early 1990's, the Barneses extended pipeline No. 1 by installing another pipeline (pipeline No. 2) from the Street property to the Tyeryar property. This allowed the Barneses to convey a portion of their first priority water from the Street property to the Tyeryar property.

In 1994, the Hussas complained to the Department of Water Resources about this practice. Eventually, in June 1999 and then again in April 2000, the Hussas notified the Barneses that the permission to maintain pipeline No. 1 across the Vawter property was revoked. In the latter letter, the Hussas told the Barneses they had until May 1 to make other arrangements for the transfer of their water.

On May 2, 2000, the Barneses commenced this action against the Hussas, seeking an injunction preventing the Hussas from interfering with pipeline No. 1 and a declaration that the Barneses have an irrevocable right to continue using that pipeline. That same day, the Barneses obtained an ex parte temporary restraining order against the Hussas (which was apparently served on John Hussa later that day as he was attempting to dig up the pipeline with a backhoe).

In June 2000, the court issued a preliminary injunction precluding the Hussas from interfering with pipeline No. 1 during the pendency of the proceeding.

In September 2000, the Hussas filed a cross-complaint for declaratory and injunctive relief and contempt. Among other things, the Hussas claimed the Barneses' use of pipeline No. 2 to convey water from the Street property to the Tyeryar property violated the 1934 decree.

The case came to trial in June 2004. In a closing brief, the Hussas argued for the first time that the right to take more water for the Street property than would fit in the pipeline had been forfeited before the Barneses bought the property because for a period longer than five years the prior owners did not use any of this "excess" water.[4]

In December 2004, the trial court issued its final decision. As relevant here, the court found: (1) the Barneses had an irrevocable license to use pipeline No. 1 to convey water from south Deep Creek to the Street property; (2) the Hussas are not "substantially harmed by [the extension of the pipeline to the Tyeryar property] in that [they] may still receive on the [Hussa] property all of the water adjudicated to it in accordance with the 1934 decree"; and (3) there were no facts or evidence to support the Hussas' claim of forfeiture.

The Hussas filed a timely notice of appeal from the judgment against them.

## DISCUSSION

### I

### *Injury*

### A

### *Burden of Proof*

The Hussas first contend the trial court erred in determining they were not injured (in the court's words, "substantially harmed") by the extension of the pipeline from the Street property to the Tyeryar property. We find no error.

Because this case involves appropriative water rights originally acquired before the Water Commission Act took effect in 1914 (see Hutchins, The California Law of Water Rights (1956) p. 94), it is governed by Water Code section 1706, which provides that "[t]he person entitled to the use of water by

---

[4] Recall that under the 1934 decree, Street was entitled to 3.33 cfs of water (except in low flow conditions), but the pipeline has a carrying capacity of only 2.2 to 2.3 cfs.

virtue of an appropriation other than under the Water Commission Act or this code may change the point of diversion, place of use, or purpose of use if others are not injured by such change, and may extend the ditch, flume, pipe, or aqueduct by which the diversion is made to places beyond that where the first use was made."

■  Under this provision, a person can change the place where appropriated water is used as long as that change does not adversely affect the rights of others to the water involved. (See, e.g., *Kidd v. Laird* (1860) 15 Cal. 161, 180–181; *Hill v. Smith* (1865) 27 Cal. 475, 482; *State Water Resources Control Board Cases* (2006) 136 Cal.App.4th 674, 739 [39 Cal.Rptr.3d 189].)

Citing Water Code sections 1706 and 1725 and *Peabody v. City of Vallejo* (1935) 2 Cal.2d 351 [40 P.2d 486], the Hussas contend that as the persons seeking to change the place of use, the Barneses bore the burden of demonstrating that the change would not harm or injure other legal users of the water. The Hussas are mistaken.

The Hussas' reliance on Water Code section 1706 is misplaced because that statute does not specify who bears the burden of proof. The same is true of Water Code section 1725.[5] *Peabody* is of assistance, but it does not support the Hussas' position. In *Peabody*, our Supreme Court noted the then prevailing "general rule in this state as to the burden of proof," which was that " '[t]he party holding the affirmative of the issue must produce the evidence to prove it . . . .' " (*Peabody v. City of Vallejo, supra,* 2 Cal.2d at p. 381, quoting former Code Civ. Proc., § 1981.) The court then stated, however, that "when one enters a field of water supply and seeks by appropriation to take water from such supply on the claim that there is more than sufficient for all reasonable beneficial uses by those who have the prior and preferential right, it would seem to comport with the principles of fairness and justice that the appropriator, in whatever way the issue may arise, should have the burden of proving that such excess exists." (*Peabody,* at p. 381.)

Obviously, the latter passage from *Peabody* is of no assistance here, since the Barneses were not seeking to establish the existence of excess water

---

[5] The Hussas' reliance on Water Code section 1725 is also misplaced because that statute addresses when "[a] permittee or licensee may temporarily change the point of diversion, place of use, or purpose of use due to a transfer or exchange of water or water rights . . . ." The reference to "[a] permittee or licensee" is a reference to someone who acquired water rights after 1914, when the Water Commission Act gave control over appropriations of water to an administrative agency and required a person seeking to appropriate water to submit an application to the agency to obtain a permit and, eventually, a license. (See Stats. 1913, ch. 586, § 16, p. 1021.) The Barneses are neither permittees nor licensees because their water rights were originally acquired before 1914.

available for a new appropriation notwithstanding preexisting rights. *Peabody*'s reference to the general rule as to the burden of proof is helpful, however. That rule, now found in Evidence Code section 500, is that "a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting."

Here, it is the Hussas who seek to enjoin the Barneses' conveyance of first priority water through a pipeline to the Tyeryar property, and thus it is the Hussas who must establish that the change of place of use from the Street property to the Tyeryar property injures their right to water from south Deep Creek. Thus, the Hussas bore the burden of proving such injury. (See *Brown v. Smith* (1858) 10 Cal. 508, 510 [in a similar case, "it was incumbent on the plaintiff to prove that defendant had diverted more water from Rabbit Creek than he was entitled to, and that he (plaintiff) had been injured thereby . . ."].)

B

*The Right to First Priority Water*

Since the trial court essentially found the Hussas were not injured by the Barneses' conveyance of first priority water to the Tyeryar property, the question before us is whether the Hussas made a showing in the trial court which required that court to find they *were* injured. The Hussas contend this showing was made because the use of first priority water on the Tyeryar property has deprived them of first priority water they are entitled to use on the Hussa property. They assert that, under the decree, if the Barneses do not use their entire allotment of first priority water on the Street property in low flow conditions, "the 'unused' portion of the allotment goes back into the available supply to be prorated between the other two properties in accordance with their respective allotments." "In summary, the Decree provides that first priority water that is not reasonably and beneficially used on specifically designated parcels is to remain in a common pool to be prorated between the other first priority parcels to the extent such water is reasonably and beneficially used on the specified acreage." Thus, the Hussas contend they (along with Bush's successor) are entitled to any first priority water the Barneses do not put to beneficial use on the Street property in low flow conditions, and they are injured by the Barneses' conveyance of that water to the Tyeryar property.

We are not persuaded. The Hussas do not point to *anything* in the 1934 decree to support their assertion that under the decree any unused first priority water in low flow conditions belongs to the other first priority users,

thus enlarging their rights. The Hussas claim "[t]he undisputed testimony of the Watermaster witnesses and Mr. Barnes comport with this interpretation," but we do not agree. In any event, even if the witnesses did express this understanding of the 1934 decree, it would not assist the Hussas unless the witnesses' interpretation of the decree were a *reasonable* one. Just because a witness interprets a document a particular way does not mean the document is *reasonably* susceptible to that interpretation.

Here, the 1934 decree is silent on what happens to first priority water that is not put to use by one of the first priority users. In fact, one of the witnesses from the Department of Water Resources (which is responsible for providing the watermasters who supervise diversions under the 1934 decree) admitted this fact and essentially testified that "the water master has to make decisions what to do" when a water user does not use the water to which he is entitled. It thus appears to be a practice of the watermasters, not compelled by the decree itself, to allocate unused first priority water among other first priority users who are already using their own first priority water, rather than making that water available to lower priority users.

## C

### *Change of Place of Use*

In any event, even if we were to assume the Hussas have a right under the 1934 decree to first priority water not used by the Barneses, that fact alone would not establish injury because the Barneses *are* using their first priority water—they are just using it on the Tyeryar property, rather than the Street property. Thus, to establish injury, the Hussas had to show they have a right under the 1934 decree to first priority water not used by the Barneses *on the Street property*. They did not make that showing.

The 1934 decree did provide that "the allotments of water from . . . Deep Creek and its tributaries as hereinafter set forth are for use upon the acreages described in Schedule 1 hereunto annexed and made a part hereof" and that the parties "are entitled to rights in and to the use of the natural flow of Deep Creek and its tributaries . . . upon their respective lands as described in Schedule 1 hereof." Thus, the decree contemplated that the first priority water to which Street was entitled would be used on the 163.7 acres of irrigated land on the property she owned—i.e., the Street property. In 1934, however, it had long been the law of California (as it still is today) "that the

person entitled to the use of water may change the place of diversion, or the place where it is used, or the use to which it was first applied, if others are not injured by such change."[6] (*Ramelli v. Irish* (1892) 96 Cal. 214, 217 [31 P. 41]; see generally Hutchins, The California Law of Water Rights, *supra*, p. 177 [change in place of use].) Accordingly, although the decree contemplated the water to which Street was entitled would be used on the Street property, the law allowed Street and/or her successors to use that water elsewhere, if they could do so without injuring the rights of others to the water from Deep Creek.

Our Supreme Court's decision in *Byers v. Colonial Irrigation Co.* (1901) 134 Cal. 553 [66 P. 732] supports this conclusion. The *Byers* case originated in Lassen County, where Willow Creek flows into Susan River, which then flows into Honey Lake. (*Id.* at p. 554.) Under an earlier adjudication, the plaintiffs were entitled to all of the waters of the creek, and to all of the waters of the river except those waters the defendant irrigation company was entitled to divert from the river above its junction with the creek. (*Ibid.*) The irrigation company subsequently built a dam just below the mouth of Willow Creek and used it to interfere with the plaintiffs' use of water from the river and the creek. (*Ibid.*) The trial court enjoined the irrigation company from using the dam to interfere with the plaintiffs' water rights, but the plaintiffs were not satisfied. On appeal, they argued the irrigation company "should have been enjoined from diverting any water from the river below its confluence with Willow Creek." (*Id.* at p. 555.)

The Supreme Court rejected this argument, stating as follows: "[I]t is clear that the right adjudicated to the defendant's predecessors by the former decree was merely the right to divert the waters of the river above its junction with Willow Creek . . . . It cannot be claimed, therefore, that the defendant derived from the decree any right to divert the water of the river below the mouth of Willow Creek; and still less that it could thus acquire any right to divert the waters of that creek, or to obstruct them. But, under the provisions of [former] sections 1412 and 1413 of the Civil Code, it had the right to change the point of diversion, provided the plaintiffs were not injured by the change; and there is nothing in the findings to indicate that the water to which the defendant was entitled could not be diverted at the dam without such injury."[7] (*Byers v. Colonial Irrigation Co.*, *supra*, 134 Cal. at p. 555.)

Similarly, here the right adjudicated to the Barneses' predecessor (Street) by the 1934 decree was the right to divert a certain amount of water from

---

[6] Of course, if the appropriative water right was obtained after the enactment of the Water Commission Act in 1914, the State Water Resources Control Board must approve the change. (See Wat. Code, § 1702.)

[7] Former Civil Code section 1412 was the predecessor statute to Water Code section 1706. (See Derivation, 68 West's Ann. Wat. Code (1971 ed.) foll. § 1706, p. 418.)

south Deep Creek for use on the Street property. Although the decree did not give Street or her successors any right to use that water on any other property, the law of California (as currently expressed in Water Code section 1706) *did* give them that right, provided the change in the place of use did not injure any others with rights to the water in Deep Creek, including the Hussas.

■    Injury from a change in place of use generally occurs when use at the new location results in the appropriator using a greater amount of water than he was entitled to (see, e.g., *Santa Paula Water Works v. Peralta* (1896) 113 Cal. 38, 45 [45 P. 168]) or when use at the new location reduces return flows to the watercourse, thus reducing the amount of water available for diversion by downstream users (see *Scott v. Fruit Growers Supply Co.* (1927) 202 Cal. 47, 52–53, 55 [258 P. 1095]). No such injury was shown here. There was no evidence use of the first priority water on the Tyeryar property rather than the Street property has any effect on return flows. Furthermore, there was no evidence the Barneses were using more first priority water than they were entitled under the 1934 decree. That decree entitled the Barneses to use 3.33 cfs of first priority water from south Deep Creek, or, under low flow conditions, 66.6 percent of the total flow at the head of the Sharp and Messier Ditch. There was no evidence the Barneses ever used any more than these amounts.

■    In essence, the Hussas' claim of injury is based on the premise that the Barneses have no right to use first priority water anywhere but on the Street property, but that premise is simply not supportable. Under the well settled rule of California water law discussed *ante*, the Barneses could use the water elsewhere if they could do so without injuring the Hussas' water rights. To allow the Hussas to claim injury based on the premise that the Barneses were limited to using their first priority water on the Street property would allow the Hussas to claim injury by bootstrapping and would deny the Barneses the benefit of that rule. Accordingly, the trial court did not err in concluding the Hussas were not injured by the Barneses' use of their first priority water on the Tyeryar property.

## II

### *Expansion of the License for the Pipeline*

The Hussas next contend that because the original license for pipeline No. 1 contemplated the use of that pipeline to convey water to the Street property, the Barneses' use of the pipeline "to convey water to the Tyeryar property is a material change and expansion of the license" which is unlawful. We disagree.

■ An irrevocable license, such as the one the court found here, is for all intents and purposes the equivalent of an easement. (See *Noronha v. Stewart* (1988) 199 Cal.App.3d 485, 490 [245 Cal.Rptr. 94].) "It is well settled that the owner of an easement cannot change its character, or materially increase the burden upon the servient estate, or injuriously affect the rights of other persons, but within the limits named he may make repairs, improvements, or changes that do not affect its substance." (*Burris v. People's Ditch Co.* (1894) 104 Cal. 248, 252 [37 P. 922].)

The question here is whether by conveying the same amount of water through the same pipeline, but to a different end location, the Barneses have materially increased the burden of the pipeline on the Vawter property. The Hussas do not point to any facts establishing such an increase; instead, they rely on the principle that the "[u]se of an appurtenant easement for the benefit of any property other than the dominant tenement is a violation of the easement because it is an excessive use [citations]; such use would amount to an increase of burden upon the servient tenement . . . ." (*Wall v. Rudolph* (1961) 198 Cal.App.2d 684, 695 [18 Cal.Rptr. 123].)

This principle is of no aid to the Hussas. First, the Hussas fail to explain why the irrevocable license to maintain a pipeline across the Vawter property must be treated as an easement appurtenant to the Street property that may be used only for the benefit of that property. Second, *Wall* and the cases on which it relies involved rights of way. For example, *Myers v. Berven* (1913) 166 Cal. 484 [137 P. 260]—one of the cases cited in *Wall*—specifically states that "[a] private way granted or reserved to one person for use in connection and as an appurtenance to specified land, cannot be used as of right for the benefit of another parcel." (*Myers, supra,* at p. 489.)

Obviously, a road is different than a pipeline. The Hussas point to no authority holding that a person with a pipeline easement is forbidden from changing the destination of the water that runs through the pipeline because such a change necessarily increases the burden on the land through which the pipeline runs. In the absence of such authority, and in the absence of any evidence that the conveyance of water through pipeline No. 1 for ultimate use on the Tyeryar property, rather than on the Street property, has adversely impacted the Vawter property, the Hussas failed to establish an impermissible expansion of the license to maintain the pipeline.

## III

### *Forfeiture*

Finally, the Hussas contend the Barneses' predecessors in interest forfeited the right to use any more than the water that will fit through the pipeline, and the trial court erred in finding no forfeiture. Again, we find no error.[8]

"Failure to exercise an appropriative water right subjects it to loss by forfeiture pursuant to the provisions of statute." (Hutchins, The California Law of Water Rights, *supra*, p. 291.) If the water right is not exercised, in whole or in part, for a period of five years, it is wholly or partially lost. (*Smith v. Hawkins* (1898) 120 Cal. 86, 87 [52 P. 139]; Wat. Code, § 1241.)

Here, the Hussas' claim of forfeiture is premised on the testimony of two witnesses who claimed familiarity with irrigation practices on the Street property from the late 1960's to the early 1980's. Peter Weber testified that his family owned the Street property in the "neighborhood of maybe '67 up until the time that" someone named Robinson "purchased the property." Weber guessed that occurred sometime in the late 1970's.

Weber claimed he was "pretty much the manager" of the property "[p]robably a few years after the initial purchase" and was out in the field "[p]eriodically." According to Weber, during that time the Street property was irrigated only through the pipeline, and no ditches were used. He was aware that there was excess water "that didn't fit into the pipeline that would go down into the . . . Sharp Messier ditch," but he never claimed any of that water.

William Benner testified that he leased the Street property "[p]robably" in the early 1980's. He used the pipeline to irrigate the property, but did not use any ditches.

Based on this testimony, the Hussas contend the trial court was compelled to find that the right to use more water than will fit in the pipeline was forfeited before the Barneses ever acquired the Street property; thus, their

---

[8] We have some concern about the manner in which the forfeiture issue was raised here. The Hussas did not raise that issue in their complaint or, it appears, in any manner prior to the filing of their initial posttrial brief. The Barneses complained about this in their posttrial brief, but they have not renewed that complaint on appeal, choosing instead to contest the Hussas' arguments on their merits. Because we agree with the Barneses that the trial court was not compelled as a matter of law to find a partial forfeiture of their water rights in this case, we need not address the effect of the Hussas' delay in raising this issue.

water rights must be limited to the amount of water that will fit in the pipeline. This argument is flawed for several reasons.

First, the Hussas presume the trial court believed the testimony of Weber and Benner, but there is nothing in the record to indicate the court did so. Although the court noted the existence of their testimony in its judgment, the court did not state that it believed that testimony. Instead, the court specifically found "there were presented no facts or evidence which would support Hussa's contention that there has been a forfeiture of the so-called excess water that will not fit through pipeline 1." For all we know on this record, the trial court may have not believed what Weber and Benner claimed had happened decades earlier.

Second, even if the court believed Weber and Benner, their testimony was insufficient to establish a partial forfeiture of the water rights now belonging to the Barneses. To establish a forfeiture of the Barneses' right to more than the 2.2 or 2.3 cfs that will fit through the pipeline, the Hussas had to offer evidence that, for a period of at least five years, such "excess" water was, in fact, available for diversion, but the Barneses' predecessors failed to divert it. There was no such evidence.

Benner testified only that he used the pipeline, rather than the ditches, to irrigate the Street property. He never testified that there was additional water to which he was entitled that he could have diverted through the ditches but chose not to.

As for Weber, he did testify that he was aware there was excess water that would go into the Sharp and Messier Ditch, and he never claimed any of that water. What he did not testify to was whether that excess water was water to which he was entitled, or when or how often this excess water was present. On this evidence, it is possible the excess water Weber saw going into the Sharp and Messier Ditch was, in fact, water the Hussas were entitled to take through that ditch. Furthermore, even assuming this water belonged to Weber, Weber did not testify that he relinquished that water over the five-year period necessary to result in forfeiture.

In short, the trial court was correct in finding there was no evidence sufficient to support the Hussas' forfeiture claim.

## DISPOSITION

The judgment is affirmed. The Barneses shall recover their costs on appeal. (Cal. Rules of Court, rule 27(a).)

Blease, Acting P. J., and Nicholson, J., concurred.